[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11392
_____

D.C. Docket No. 10-02872-LMI

IN RE: BANKUNITED FINANCIAL CORPORATION, et al.,

Debtors,
_____

CLIFFORD A. ZUCKER,
Plan Administrator,
CRE AMERICA CORPORATION,
BU REALTY CORPORATION,

Plaintiffs - Appellees,

versus

FDIC, in its capacity as Receiver of BankUnited, FSB,

Defendant - Appellant.

_____

Appeal from the United States Bankruptcy Court
for the Southern District of Florida
_____

(August 15, 2013)

Before TJOFLAT, PRYOR, and FAY, Circuit Judges.

TJOFLAT, Circuit Judge:

## I.

United States Department of Treasury regulations provide that a parent corporation may file in its own name a consolidated income tax return for itself and its subsidiary corporations (the "Consolidated Group" or "Group").[1] In addition to filing the tax return in its own name, the parent corporation receives in its name any income tax refunds due the members of the Consolidated Group.[2] Federal law does not govern the allocation of the Group's tax refunds; hence, a parent and its subsidiaries are free to provide for the allocation of tax refunds by contract.

This case involves the allocation of tax refunds pursuant to a Tax Sharing Agreement ("TSA") entered into in 1997 by two members of a Consolidated Group, the parent corporation, called BankUnited Financial Corporation (the

---

[1] 26 C.F.R. § 1.1502-77 ("[T]he common parent . . . is the sole agent (agent for the group) that is authorized to act in its own name with respect to all matters relating to the tax liability for the consolidated return year . . . . No subsidiary has authority to act for or to represent itself in any matter . . . ."); id. ("[A]ny refund is made directly to and in the name of the common parent . . . .").

[2] "[The consolidated tax return] regulations are basically procedural in purpose and were adopted solely for the convenience and protection of the federal government." In re Rob Richards Chrysler-Plymouth Corp., 473 F.2d 262, 265 (9th Cir. 1973); In re First Cent. Fin. Corp., 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001) ("[U]nder applicable I.R.S. regulations, a parent company acts as agent for the consolidated group in filing consolidated tax returns [but] this agency is purely procedural in nature, and does not affect the entitlement as among the members of the Group to any refund paid by the I.R.S.").

2

"Holding Company"), and one of its subsidiaries, called BankUnited FSB (the "Bank"), the principal operating entity for the Consolidated Group. The TSA was entered into for the benefit of the Holding Company, the Bank, and the remaining subsidiaries in the Group.

The TSA provides that, whereas the Holding Company files the Group's income tax return, the Bank pays all of the taxes due. Within thirty days after the return is filed and the taxes are paid, the members of the Group reimburse the Bank for their share of the taxes the Bank paid. The TSA also provides that the Bank, within thirty days of the Holding Company's filing of an income tax return, pay the members of the Group any tax refund they expect or are entitled to receive.

On May 21, 2009, the Office of Thrift Supervision closed the Bank and appointed the Federal Deposit Insurance Corporation ("FDIC") as the Bank's receiver. The next day, the Holding Company petitioned the United States Bankruptcy Court for the Southern District of Florida for relief under Chapter 11 of the Bankruptcy Code.[3] After the Holding Company filed the petition, the Holding Company and the Bank requested refunds from the Internal Revenue Service ("IRS") for fiscal years 2007 and 2008 in the respective sums of

---

[3] In re BankUnited Financial Corp., No. 09-19940 (S.D. Fla. filed May, 22, 2009). In addition to the Holding Company, two of its subsidiaries, BankUnited Financial Services, Inc., and CRE America Corporation, also petitioned the Bankruptcy Court for Chapter 11 relief. The court consolidated the cases, which explains why these subsidiaries are shown as plaintiffs and appellees along with the Holding Company and BU Realty Corporation, a Holding Company subsidiary that is not in bankruptcy. In this opinion, we refer to the plaintiffs and appellees as the Holding Company unless otherwise necessary for the context.

$5,566,878 and $42,552,226.  Their request was granted, and the refunds were sent to the Holding Company.  Rather than forward the refunds to the FDIC for distribution as provided in the TSA, however, the Holding Company decided to retain the refunds as an asset of its bankruptcy estate.  The FDIC responded to the Holding Company's action by filing a claim in the Chapter 11 proceeding, asserting that it was entitled to receive the refunds so that it could comply with its contractual obligation to distribute them to the members of the Group.  With the court's approval, the Holding Company and the FDIC stipulated that the refunds be held in escrow pending the Bankruptcy Court's decision as to whether, as the Holding Company contended, the refunds were an asset of the bankruptcy estate. The Holding Company thereafter commenced an adversary proceeding against the FDIC by filing a multi-count complaint.  Counts 1 and 2 are relevant here; Count 1 challenged the sufficiency of the FDIC's claim, and Count 2 sought a declaration that the refunds constituted an asset of the bankruptcy estate.

On cross-motions for summary judgment, the Bankruptcy Court declared that the refunds were indeed assets of the bankruptcy estate.  Specifically, on receipt, the refunds became the property of the Holding Company and thus the bankruptcy estate.  However, because the Holding Company was required "at some point" in time to transfer the refunds to the FDIC, it became indebted to the FDIC. Record, no. 165, at 22.  The Bankruptcy Court therefore granted judgment in favor

of the Holding Company.  The parties thereafter requested the Bankruptcy Court to certify the judgment for appeal to this court.  We granted their request and lodged the appeal.  See 28 U.S.C. § 158(d)(2)(A).[4]

## II.

The sole issue in this appeal is whether the Bankruptcy Court erred in declaring the tax refunds an asset of the bankruptcy estate.[5]  For ease of discussion,

---

[4]  We have jurisdiction to hear a direct appeal of a final judgment from the Bankruptcy Court pursuant to 28 U.S.C. § 158(d)(2).  That provision provides in relevant part:

> (A) The appropriate court of appeals shall have jurisdiction of appeals [from final judgments of bankruptcy judges entered in cases and proceedings referred to bankruptcy judges under 28 U.S.C. § 157] if the bankruptcy court . . . acting on its own motion or on the request of a party to the judgment . . . , or all the appellants and appellees (if any) acting jointly, certify that—

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance.

> . . . .; or

> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

> and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

> (B) If the bankruptcy court . . . .

> (ii) receives a request made by a majority of the appellants and a majority of appellees (if any) to make the certification described in subparagraph (A); then the bankruptcy court . . . shall make the certification described in subparagraph (A).

[5] The FDIC contends that 12 U.S.C. § 1821(d)(13)(D) precluded the Bankruptcy Court from deciding the issue because, in its view, the tax refunds constitute an asset of the FDIC receivership.  See 12 U.S.C. § 1821(d)(13)(D) ("Except as otherwise provided, no court shall

5

we analyze this case as if the controversy occurred prior to the filing of the Chapter 11 petition; the Holding Company refused to turn the refunds over to the Bank for distribution amongst the members of the Consolidated Group. We do so because the Holding Company in bankruptcy stands in the shoes it was wearing pre-bankruptcy. By the same token, the FDIC stands in the shoes the Bank was wearing. That said, the question for the Bankruptcy Court, and this court, is a matter of contract interpretation. Under the TSA, are the tax refunds the property of the Holding Company?

## A.

The TSA provides that Delaware law governs its enforcement. Record, no. 91-1, at 2. Our inquiry focuses on recital A and sections 2 through 4 of the TSA. Recital A describes the purpose of the TSA.

> A. The [Holding] Company and [the Bank] desire to provide for the allocation of current and deferred income tax assets and liabilities

---

have jurisdiction over . . . any action seeking a determination of rights with respect to[] the assets of [the FDIC receivership].”). According to the FDIC, 12 U.S.C. § 1821(d)(6) provides the only avenue for judicial review of a claim against an asset of the FDIC receivership—and that provision grants federal jurisdiction only to the district court, not the bankruptcy court. See 12 U.S.C. § 1821(d)(6) (“The claimant may . . . file suit on [a claim against the FDIC receivership] in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).”).

The FDIC's argument is unpersuasive. Section 1821(d)(13)(D) applies only to assets of the FDIC's receivership. It therefore does not preclude the Bankruptcy Court from determining the threshold question of whether the tax refunds are an asset of the bankruptcy estate. In this case, we hold that the tax refunds are not an asset of the bankruptcy estate. The refunds accordingly revert to the FDIC for distribution to the members of the Group in accordance with the provisions of the TSA. The tax refunds will constitute an asset of the receivership if and when a portion of the refunds is distributed to the FDIC receivership.

between the [Holding] Company, [the Bank] and other members of the [Consolidated] Group.

Id. at 1.

Section 1 of the TSA provides that the Bank, not the Holding Company, pays all taxes to the government.

> 1.  Payment of Income Taxes.  [The Bank] shall be responsible for making all consolidated income tax payments on behalf of the [Group] to the [IRS[6]] based upon periodic income tax returns in accordance with the [Internal Revenue] Code, and other payments required from time to time including, but not limited to[,] estimated tax payments, tax penalties and interest, and tax deficiencies.

Id.

Section 2 of the TSA describes the process in which members of the Group determine their individual income tax liabilities.

> 2.  Determination of Income Tax Assets and Liabilities.  [The Holding Company] and [the Bank] agree to determine the current and deferred income tax assets and liabilities of each member of the [Group] on a separate-entity basis.  Each member of the Group will determine its individual portion of the consolidated income tax assets and liabilities in accordance with the [Internal Revenue] Code without regard to any income tax expenses or benefits of other members of the Group and shall record the amounts so determined in accordance with Generally Accepted Accounting Principles ("GAAP").  Each member of the Group shall allocate its income tax assets and liabilities between current and deferred in accordance with GAAP no less frequently than on an annual basis.

Id.

---

[6] The TSA applies to payments to all taxing authorities.  For ease of discussion, we limit the opinion to taxes due the IRS.

7

Section 3 of the TSA describes how the individually determined income tax liability for each member of the Group is aggregated and adjusted for the preparation of a consolidated tax return.

> 3. <u>Determination of Inter-Company Income Tax Receivables and Payables</u>. Each member of the Group shall record an inter-company income tax receivable or payable with [the Bank] in the amount of its current net income tax asset or liability as determined in Section 2. Upon the filing of any consolidated tax return or amended return, the inter-company income tax receivables or payables of all members of the Group shall be adjusted to reflect its share of the actual consolidated income tax payable or receivable as determined on a separate-entity basis.

<u>Id.</u> at 1-2. It is important to note the difference between the terms "assets" and "receivables," as well as the terms "liabilities" and "payables," as they are used in the TSA. The TSA uses the term "assets" when it refers to tax refunds to which members of the Group are entitled from the government; it uses the term "liabilities" when it refers to taxes that members of the Group owe to the government. The TSA uses the terms "payables" and "receivables" when referring to <u>inter-company</u> obligations. An "income tax payable" refers to the amount that a member owes to the Bank as reimbursement for the Bank paying its share of taxes owed to the government. An "income tax receivable" refers to the amount to which a member is entitled from the Bank as a result of a tax refund from the government.

Section 4 of the TSA describes the payment and reimbursement process among the members of the Group:

> 4. <u>Settlement of Inter-Company Income Tax Receivables and Payables</u>. Within 30 days following the remittance by [the Bank] of any income tax payment, any member of the Group having a net inter-company income tax payable as determined under Section 3 shall pay to [the Bank] such amount as reimbursement for payment of its proportional share of the consolidated current income tax liability. In the event that [the Bank's] separately determined current income tax results in an asset or receivable, the amount of the inter-company settlement shall have the effect of reimbursing [Bank] for 100% of the income tax payment, and at no time shall the amount of unsettled inter-company taxes under this section cause the amount paid by [Bank], net of receipt of inter-company amounts, to exceed the amount that would have been due and payable to the taxing authorities if [Bank] were filing its tax return on a separate-entity basis. Not less frequently than annually following the filing of any periodic income tax return or amended return, and within 30 days of such event, each member of the Group having a net inter-company income tax payable shall pay such amount to [the Bank]; and [the Bank] shall reimburse any member of the Group for net inter-company income tax receivables. Any income tax refunds received by [the Bank] shall be allocated among, and paid to the members of the Group in accordance with Sections 2 and 3.

<u>Id.</u> at 2. The plain language of  section 4 of the TSA directs that within thirty days after the Bank pays the taxes owed to the government on behalf of the Group, any member that owed taxes must reimburse the Bank for its proportional share of the Group's tax payment. In the event the Bank itself is entitled to a tax refund, the amount of money transferred to the Bank by members of the group that owed taxes, and whose taxes were paid by the Bank, shall reimburse the Bank 100% for any payment it made on behalf of those members. At no point shall the amount of

9

taxes paid by the Bank on behalf of the group, net of any transfers of money already made by members of the Group to the Bank, exceed the amount of taxes the Bank would have to pay the government were it filing an individual tax return. Within thirty days of the Holding Company's filing of a tax return or an amended return, each member owing taxes shall pay the amount it owes to the Bank, and the Bank shall reimburse any member owed a tax refund.  The Bank will distribute tax refunds according to each member's determination of the refund it is due, per Section 2 of the TSA, as adjusted to reflect each member's proportional share of the group's tax assets and liabilities, per Section 3 of the TSA.

It is clear, as the Holding Company has contended, that section 4 contains no words instructing the Holding Company to forward to the Bank any tax refunds it receives.  It is also clear, as the Holding Company has acknowledged, that the Bank is obligated to distribute any tax refunds that the Holding Company receives to the Group's members—including to itself and the Holding Company.  To do this, the Bank must have possession of the refunds—it must receive them from the Holding Company.  Thus, it is clear that the Holding Company must at some point forward the refunds to the Bank.

Section 4 is ambiguous in two respects: first, section 4 does not state when the Holding Company must forward the tax refunds to the Bank, and second, it

10

does not explain whether the Holding Company "owns" the refunds before forwarding them to the Bank.

### B.

Under Delaware law, the members of the Consolidated Group were free to allocate the ultimate disposition of tax liabilities and tax savings by agreement. See e.g., Abex, Inc. v. Koll Real Estate Group, Inc., No. 13462, 1994 WL 728827, at *15 (Del. Ch. Dec. 22, 1994) ("[M]embers of the group [may] allocate the ultimate tax liability among themselves by contract.") (citation omitted). Where, as here, operative provisions of a contract are ambiguous, the court's task is to determine the intent of the parties. In Delaware, as in typical common law jurisdictions, the contract "must be read in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction." Rohner v. Niemann, 380 A.2d 549, 552 (Del. 1977) (citation omitted). In other words, the court infers the parties' intent.

In undertaking to discern the parties' intent, the Bankruptcy Court began with the assumption that at some point, the Holding Company had to forward the tax refunds to the Bank. "There is no question that the [TSA] presumes that at some point the Holding Company is going to deliver a tax refund to the Bank; that is implicit in the [TSA's] provisions that the Bank gives out the allocable shares in any refund to the group." Record, no. 165, at 22. But, in the next breath, the court

11

flatly contradicted this presumption, with the statement that "there is also no question that the [TSA] does not require the Holding Company to deliver those funds to the Bank . . . ." Id. According to the court, the TSA did not require the Holding Company to deliver the funds because there is nothing "in the [TSA to] suggest that the Holding Company accepts those funds from the IRS in any kind of trust or agency capacity or holds those funds under any specialized status that would cause those funds to be considered something other than the property of the Holding Company when in its possession." Id. In stating that there is nothing "in the [TSA to] suggest," the court was holding that there is nothing in the language of the TSA that would imply that the refunds, while in the hands of the Holding Company, were anything other than unencumbered assets of the company.

Yet, the court ultimately found that the Holding Company became indebted to the Bank in a sum equivalent to the amount of the refunds it received from the IRS. The court appears to reach this finding by noting that the TSA describes

> the entire relationship between the various members of the [Group] . . . only in terms of payables and receivables—inter-company debts and claims. Depending on how the tax balance sheet obligations are set up at a particular time, the fact that the Bank, when it holds the funds, stands as the debtor or creditor, does not change the fact that when the Holding Company holds the funds it also has the status of the debtor or creditor.

12

Id. at 22-23.[7]  In short, the Holding Company is the Bank's debtor.  The tax

refunds are assets of the Holding Company.   In the Bankruptcy Court's view, if

the Holding Company does not forward the refunds to the Bank, the Bank's only

recourse is to sue the Holding Company, obtain a money judgment, and, if

necessary, satisfy that judgment via the writs provided by the forum for obtaining

the satisfaction of money judgments.  Since the Holding Company is in

bankruptcy, the Bank, i.e., the FDIC as its receiver, must file a claim as an

unsecured creditor.

C.

Although the TSA does not contain a provision expressly requiring the

Holding Company to forward the tax refunds to the Bank on receipt, it is obvious

to us that this is what the parties intended.  That is, they did not intend that the

Holding Company keep the refunds and incorporate them into its own portfolio, as

if the Bank had loaned the refunds to the Holding Company unencumbered.[8]

A debtor-creditor relationship is created by consent, express or implied.  We

find no words in the TSA from which it could reasonably be inferred that the

parties agreed that the Holding Company would retain the tax refunds as a

company asset and, in lieu of forwarding them to the Bank, would be indebted to

---

[7]  Although the court did not cite the provisions of the TSA referred to, we assume that it was referring primarily to words—"payables" and "receivables"—in section 4.

[8]  In holding that the parties intended a debtor-creditor relationship, the Bankruptcy Court implicitly eschewed the thought that the Holding Company tortiously converted the tax refunds, in which case it would not be liable to the Bank as a debtor but as a tortfeasor.

13

the Bank in the amount of the refunds. Nor do we find any words from which the terms of the indebtedness could be inferred. If, as the Bankruptcy Court concluded, the parties created a debtor-creditor relationship, we would expect to find some means of protection for the creditor that would help guarantee the debtor's obligation, such as a fixed interest rate, a fixed maturity date, or the ability to accelerate payment upon default. See Lasker v. Mcdonnell & Co., Inc, No. 3560, 1975 WL 1950, at *10 (Del. Ch. July 9, 1975). The Bankruptcy Court found none of these elements. All it found was that the Holding Company would "deliver a tax refund to the Bank" at "some point" in time.

The effect of the Bankruptcy Court's decision that the tax refunds constitute an unencumbered asset of the Holding Company is to frustrate the Bank's ability to discharge its obligation to distribute to the members of the Group the portion of the tax refunds to which they are entitled. In short, the court's decision undermines a paramount purpose of the TSA, which is to ensure that the tax refunds are delivered to the Group's members in full and with dispatch.

If the court's decision is allowed to stand, this is what would transpire if the Holding Company and the Bank were in a debtor-creditor relationship. If the Holding Company refused to forward the tax refunds on receipt, the Bank's only recourse would be to file suit. Assuming the litigation were successful, the Holding Company, the Bank, and the other members of the Group would share in

14

the litigation expenses the bank incurred in collecting on the Holding Company's debt. Thus, before the Bank would give these beneficiaries their portion of the refunds, it would subtract such expenses from the amount of the refunds available for distribution. We cannot imagine that the Bank and the other subsidiary corporations in the Group contemplated this scenario when the Bank and the Holding Company signed the TSA.

### III.

The relationship between the Holding Company and the Bank is not a debtor-creditor relationship. When the Holding Company received the tax refunds, it held the funds intact—as if in escrow—for the benefit of the Bank and thus the remaining members of the Consolidated Group. The parties intended that the Holding Company would promptly forward the refunds to the Bank so that the Bank could, in turn, forward them on to the Group's members. In the Bank's hands, the tax refunds occupied the same status as they did in the Holding Company's hands—they were tax refunds for distribution in accordance with the TSA.

For these reasons, we reverse the Bankruptcy Court's judgment and direct the Bankruptcy Court to vacate its decision declaring the tax refunds the property of the bankruptcy estate and to instruct the Holding Company to forward the funds

held in escrow to the FDIC, as receiver, for distribution to the members of the

Group in accordance with the TSA.[9]

SO ORDERED.

---

[9] In part I of this opinion, we indicate that the complaint the Holding Company filed to commence its adversary proceeding against the FDIC contained multiple counts. Included in those counts were a variety of claims unrelated to the Holding Company's claim to the tax refunds for fiscal years 2007 and 2008. There is some indication in the record that the parties may have entered into a settlement agreement prior to the Bankruptcy Court's issuance of the decision at issue in this appeal. Our decision in this appeal is a narrow one; it only involves the Bankruptcy Court's determination that the tax refunds are property of the bankruptcy estate.