[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13965
_____

D.C. Docket No. 3:11-cv-00011-TJC,
BKCY No. 3:07-bk-04295-JAF

In Re: NETBANK, INC.,

Debtor.

_____

FDIC,
as Receiver for NetBank,

Plaintiff-Appellant,

versus

CLIFFORD ZUCKER,
in his capacity as Liquidating Supervisor for NETBANK, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 10, 2013)

Before HULL, ANDERSON, and FARRIS,[*] Circuit Judges.

ANDERSON, Circuit Judge:

This appeal requires us to determine the proper bankruptcy treatment of tax refunds in light of a tax sharing agreement between a parent company, NetBank, Inc. ("NetBank"), and its subsidiary, NetBank, f.s.b. ("Bank"). Appellant Federal Deposit Insurance Corporation ("FDIC"), as receiver for the Bank, challenges the judgment of the lower courts concluding that the tax sharing agreement established a debtor-creditor relationship between the parties and awarding the tax refund to the bankruptcy estate of NetBank. As this Court recognized in its recent decision, *In re BankUnited Financial Corp.*, the determination of whether tax refunds are property of the parent or subsidiary in this context is a matter of contract interpretation. *In re BankUnited Fin. Corp.*, __ F.3d __, No. 12-11392, 2013 WL 4106387, at *2 (11th Cir. Aug. 15, 2013).[1] Because we conclude that the parties to the tax sharing agreement in this case intended to create an agency relationship rather than a debtor-creditor relationship with respect to IRS refunds attributable to

---

[*]    Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]    *BankUnited* addressed the same issue of ownership of a tax refund between a parent and subsidiary bank in the context of consolidated returns where the parties had entered into a tax allocation agreement, and similarly concluded that the TSA did not create a debtor-creditor relationship between the parties. Although the two agreements are different, we find the *BankUnited* reasoning persuasive.

2

the Bank, we reverse and remand with instructions to enter judgment in favor of the FDIC.

I.

NetBank is the parent corporation of a number of subsidiaries including the Bank. As authorized by 26 U.S.C. § 1501, NetBank filed consolidated income tax returns on behalf of itself and its subsidiaries pursuant to a tax sharing agreement ("TSA") entered into by all members of the consolidated group. The TSA defined the method by which tax liabilities of the consolidated group would be allocated and paid. The consolidated return filed by NetBank for the 2005 tax year, the relevant return for purposes of this appeal, reported taxable income of $17,987,259 and tax liability of $6,145,415.

On September 28, 2007, the Office of Thrift Supervision closed the Bank and appointed the FDIC as receiver. That same day, NetBank filed for Chapter 11 bankruptcy. NetBank and the Bank both have filed for a federal tax refund of $5,735,176 attributable to a carryback of 2006 net operating losses of the Bank to the 2005 consolidated return filed by NetBank. Both the bankruptcy estate of NetBank and the FDIC as receiver for the Bank claim ownership of the refund, which is currently being held in escrow pending the outcome of this litigation.

This adversary proceeding was initiated on behalf of NetBank's bankruptcy estate, seeking a declaratory judgment that the tax refund was property of the estate

pursuant to section 541(a) of the Bankruptcy Code,[2] and requesting that the IRS be required to turn over the refund to the estate.  The FDIC counterclaimed, arguing that the tax refund was properly the property of the Bank.  On cross-motions for summary judgment, the bankruptcy court held that the TSA created a debtor-creditor relationship between NetBank and the Bank and declared the refunds to be assets of NetBank's bankruptcy estate.  In finding a debtor-creditor relationship, the bankruptcy court relied on the discretion given to NetBank under the TSA, the fact that NetBank's obligation to pay the Bank was irrespective of whether the consolidated group received a refund, and the absence of language in the TSA requiring the parent to segregate refunds, hold the funds in trust or escrow, or otherwise restrict how refunds could be used by NetBank.  On appeal, the district court affirmed the bankruptcy court's decision, and the FDIC filed the present appeal.

## II.

The sole issue we address in this appeal is whether it was error to declare the tax refunds an asset of NetBank's bankruptcy estate.  The relevant analysis, therefore, is whether, in interpreting the TSA, the tax refund received from the IRS is property of NetBank.  We conclude that it is not.  We conclude that the courts below erred in concluding that the TSA established a debtor-creditor relationship.

---

[2]    11 U.S.C. § 541(a)(1) defines a bankruptcy estate as "all legal and equitable interests of the debtor in property as of the commencement of the [bankruptcy] case."

We hold that the parties intended for NetBank to hold the refund as agent for the Bank.

A.

NetBank and its subsidiaries entered into the TSA, effective January 1, 2003, for the purpose of defining the proper allocation of tax liabilities and payments between the members of the consolidated group.[3]  We focus on three relevant provisions of the TSA relating to the allocation of tax refunds between NetBank and the Bank—Sections 4, 9, and 10.

Section 4 of the TSA directs NetBank on how to compute consolidated net operating losses attributable to the consolidated group members, and it mandates that NetBank pay any refunds owed to subsidiaries based on carryback losses applied to prior taxable years "not later than thirty (30) days after the date on which a credit is allowed or refund is received."  TSA § 4(d).

---

[3]    As the *BankUnited* opinion states, "[f]ederal law does not govern the allocation of the Group's tax refund; hence, a parent and its subsidiary are free to provide for the allocation of tax refunds by contract."  *BankUnited*, __ F.3d at __, 2013 WL 4106387, at *1; *see also In re First Central Fin. Corp.*, 269 B.R. 481, 490 (Bankr. E.D.N.Y. 2001) ("As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly implied agreement.").  The FDIC has argued that this Court should invoke federal common law, specifically the "*Bob Richards* Rule," which establishes the agency relationship as a default relationship absent clear agreement to the contrary.  *See W. Dealer Mgmt., Inc. v. England (" In re Bob Richards Chrysler–Plymouth Corp.")*, 473 F.2d 262, 265 (9th Cir. 1973).  Following the *Bank United* decision, and implementing the express provision in the instant TSA, we apply state contract law—i.e., Georgia contract law.  We note, however, that the outcome of the instant case would not be different if the "*Bob Richards* rule" were applied.  We conclude that the intent of the parties expressed in the TSA—the controlling factor under either Georgia contract law or the federal common law as articulated in the "*Bob Richards* rule"—created an agency relationship.

5

> If the Bank Affiliated Group[4] incurs a net operating loss, a net capital loss or is entitled to credits against tax as described above in this Section, the amount payable to the Bank Affiliated Group by NetBank shall be no less than the amount the Bank would have received as a separate entity (including its subsidiaries), regardless of whether the consolidated group is receiving a refund.

*Id.* § 4(e). It is undisputed that the refund in question resulted from a net operating loss attributable solely to the Bank and carried back to a previous taxable year. Therefore, under Section 4(d) and (e) of the TSA, NetBank would be required to pay the entire amount of the refund to the Bank within thirty days of receipt from the IRS.

Section 9 of the TSA sets forth "Procedural Matters" for filing consolidated returns and gives "sole discretion" to NetBank regarding the manner of filing returns and the ability to elect what gains, losses, deductions, and credits to take on behalf of the consolidated group.

> NetBank shall prepare and file the Consolidated Return and any other returns, documents or statement required to be filed with the IRS with respect to the determination of the Federal income tax liability of the NetBank Group. In its sole discretion, NetBank shall have the right with respect to any Consolidated Returns which it has filed or will file:
>
> (a)    to determine (i) the manner in which such returns, documents or statements shall be prepared and filed, including, without limitation, the manner in which any items of income, gain, loss, deduction or credit shall be reported, (ii) whether any extensions may be requested, and (iii) the elections that will be made by any member Affiliate,

---

[4] For purposes of the TSA, the Bank and subsidiaries of the Bank are collectively referred to as the "Bank Affiliated Group."

6

(b)    to contest, compromise or settle any adjustment or deficiency proposed asserted or assessed as a result of an audit of such returns by the IRS,

(c)    to file, prosecute, compromise or settle any claim the NetBank Affiliated Group may be entitled shall be paid by the way of refund or credited against the tax liability of the NetBank Group.

Each Affiliate hereby irrevocably appoints NetBank as its agent and attorney-in-fact to take such action (including execution of documents) as NetBank may deem appropriate to effect the foregoing.

*Id.* § 9.  The language in Section 9(c) grants NetBank the authority to claim refunds on behalf of the consolidated group, and in doing so, the TSA provides that NetBank acts as "agent" for its subsidiaries, including the Bank.

Section 10(a) of the TSA states that "[t]his Agreement is intended to allocate the tax liability in accordance with the Interagency Statement on Income Tax Allocation in a Holding Company Structure."  Section 10(a) provides:

This Agreement is intended to allocate the tax liability in accordance with the Interagency Statement on Income Tax Allocation in a Holding Company Structure [OTS CEO Memo No. 98].  Under this guidance, tax settlements between the Bank Affiliated Group and the NetBank consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity.  Accordingly:

(i)    Tax remittances from the Bank Affiliated Group to NetBank for its current tax expense should not exceed the amount the Bank Affiliated Group would have paid had it filed separately.

(ii)   The tax payments by the Bank Affiliated Group to NetBank should not be made before the Bank Affiliated Group would have been obligated to pay the taxing authority had it filed as a separate entity.

7

(iii)   Should the Bank Affiliated Group incur a tax loss, it should receive a refund from NetBank in an amount no less than the amount the Bank Affiliated Group would have received as a separate entity, regardless of whether the NetBank consolidated group is receiving a refund.

(iv)   The Bank Affiliated Group should not pay its deferred tax liabilities or the deferred portion of its applicable income taxes to NetBank since these are not liabilities required to be paid in the current reporting period.

*Id.* § 10(a).

The bankruptcy court determined that the provisions within the TSA could only be interpreted as creating a debtor-creditor relationship between the parties with respect to IRS tax refunds attributable to the Bank. The court reasoned that there was no language in the TSA creating an agency or trust relationship. The bankruptcy court also expressly discounted the language in Section 9(c) as being merely procedural. Additionally, the court found that the following were indications of the debtor-creditor status: the absence of language requiring the refunds to be held in escrow or segregated, or otherwise restricting NetBank's ability to use the refunds in the thirty days before paying them out. The court placed great weight on the provisions in Sections 4(e) and 10(a)(iii), which required NetBank to pay amounts owed to the Bank "regardless of whether the NetBank consolidated group is receiving a refund." This language, the court reasoned, established an independent contractual obligation on the parent to pay the Bank and unambiguously established a debtor-creditor relationship.

Furthermore, the court discounted the impact of the Policy Statement, finding that it was only guidance and did not have the force of law, and additionally, because it was only intended to govern the particular issues of tax allocation mentioned in Section 10(a)(i)-(iv).

We conduct our review of the lower courts' summary judgment rulings *de novo*. *Jacks v. Wells Fargo Bank, N.A. (In re Jacks)*, 642 F.3d 1323, 1328 (11th Cir. 2011). Upon careful examination of all of the provisions in the TSA, and upon a review of the record and with the benefit of oral argument, we conclude that the TSA is ambiguous with respect to whether it establishes a debtor-creditor relationship or an agency relationship between NetBank and the Bank regarding refunds from the IRS that are attributable solely to the Bank. Stated another way, the TSA is ambiguous with respect to whether NetBank "owns" the refunds received from the IRS before forwarding them to the Bank.[5] In particular, we conclude that by discounting the agency language in Section 9(c) of the TSA, the bankruptcy court ignored a reasonable interpretation that the literal language of the TSA supports an agency relationship with respect to tax refunds. Additionally, we conclude that Section 10(a) can reasonably be interpreted to express the parties'

---

[5] The *BankUnited* opinion reached a similar conclusion in its interpretation of the relevant tax sharing agreement entered into by the parties. *BankUnited*, __ F.3d. at __, 2013 WL 4106387, at *4 (also finding the TSA at issue there to be ambiguous).

9

intent to comply with the language found in the Policy Statement.[6]  Because there

is more than one reasonable interpretation of the TSA, we conclude that the

language within the four corners of the TSA is ambiguous.  *See Caswell v.*

*Anderson*, 241 Ga. App. 703, 703, 527 S.E.2d 582, 582 (2000) ("Contract language

is unambiguous if it is capable of only one reasonable interpretation.").

B.

The TSA specifies that Georgia law governs the agreement, § 10(c); hence,

we will apply state law in our interpretation of the contract.  Under Georgia law,

"[t]he construction of a contract is a question of law for the court."  Ga. Code Ann.

§ 13-2-1.

> Interpretation of a contract involves three steps.  First, the court
> decides if the contract language is unambiguous, and if so the court
> enforces the contract's clear terms.  Second, if the contract is
> ambiguous, the court must apply the rules of contract construction to
> resolve the ambiguity.  And third, if the ambiguity remains after use
> of the construction rules, the meaning of the contract must be decided
> by a jury.

*Caswell*, 241 Ga. App. at 705, 527 S.E.2d at 584 (internal footnotes omitted).

Having found the TSA to be ambiguous, we apply the rules of contract

construction.  "One of those rules [of contract construction] 'is to consider the

background of the contract and the circumstances under which it was entered into,

particularly the purpose for the particular language to be construed.'"  *Horwitz v.*

---

[6]    Indeed, as we shall see below, the intent of the parties to comply with the Policy
Statement is the only plausible interpretation.

*Weil*, 275 Ga. 467, 468, 569 S.E.2d 515, 517 (2002) (quoting *Hortman v. Childress*, 162 Ga. App. 536, 538, 292 S.E.2d 200 (1982)).  In this case, the tax sharing agreement was entered into for the purpose of determining the proper method for allocating tax liabilities and assets between the parent NetBank and its subsidiaries—including a depository institution (the Bank), which is subject to substantial regulation.

When considering the background against which the TSA was entered into, we consider particularly the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg. 64,757 (Nov. 23, 1998) ("Policy Statement").  In this case, not only does the Policy Statement provide the background against which the contract was entered into, but the TSA itself expressly provides: "This Agreement is intended to allocate the tax liability in accordance with the [Policy Statement]."  Thus, in this case, there is a clear expression in the TSA that the intent of the parties was to comply with the Policy Statement.[7]

The Policy Statement contains language specifically stating that a parent receives refunds from a taxing authority as "agent" on behalf of the group members.

---

[7]    "The cardinal rule of construction is to ascertain the intention of the parties."  Ga. Code Ann. § 13-2-3.

11

> Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members. Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

*Id.* at 64,759 (citing 26 C.F.R. § 1.1502-77(a)). This provision within the Policy Statement expressly counsels against entering into a tax allocation agreement that would grant ownership to the parent of refunds attributable to the Bank. Because the parties expressly stated their intent to comply with the Policy Statement, to the extent that the TSA is ambiguous regarding the issue of ownership, this provision strongly supports the finding of an agency relationship.

Section 10(a) of the TSA also states that "tax settlements between the Bank Affiliated Group and the NetBank consolidated group should result in no less favorable treatment to the Bank Affiliated Group than if it had filed its income tax return as a separate entity." This principle is at the core of the Policy Statement; requiring the Bank to seek payment as an unsecured creditor from the bankruptcy estate of NetBank would be less favorable treatment.

Based on the language of the TSA and the Policy Statement, we conclude that the parties intended to establish an agency relationship with respect to refunds from the IRS attributable solely to the Bank. Specifically, our conclusion is based on the language of the TSA (e.g., the indication in Section 9 that NetBank acts in

12

an agency capacity with respect to tax refunds, and the expressly stated intent of the parties in Section 10(a) to comply with the Policy Statement) and on the language of the Policy Statement that a parent company such as NetBank should be deemed to receive tax refunds in an agency capacity.

It is true that there were some contraindications within the four corners of the TSA itself, namely those relied upon by the Bankruptcy Court—i.e., the obligation of NetBank to reimburse the Bank regardless of whether NetBank elects to actually receive a tax refund (rather than take a credit against future tax liability); the absence of language requiring NetBank to hold refunds in trust or escrow pending paying same over to the Bank; and the fact that the agency language with respect to tax refunds in Section 9 might reasonably be deemed merely procedural if the language were read in isolation.  These are the indications which led us to conclude that the language of the four corners of the TSA itself was ambiguous.

We need not decide what Net Bank's obligation to reimburse the Bank would be if NetBank elected not to receive a refund because those are not the facts in front of us.  In this case, there was a tax refund, and we must decide whether NetBank owns the refunds and merely has a debtor's obligation to pay it over to the Bank, or whether NetBank holds the refund as agent for the Bank.

13

We do not believe that the absence of language requiring a trust or escrow has much persuasive value.  That factor is offset entirely by the similar absence of any language indicative of a debtor-creditor relationship—e.g., provisions for interest and collateral.[8]

Finally, with respect to the ambiguity in the isolated language of Section 9—i.e., whether the express provision that NetBank acts in an agency capacity with respect to tax refunds is merely procedural or whether the provision also has substantive meaning—and with respect to the overall ambiguity within the four corners of the TSA, we conclude that such ambiguity is resolved by reference to the Policy Statement.  As noted, the Policy Statement expressly addresses how such tax sharing agreements should treat tax refunds received by the parent but attributable to a loss incurred by the subsidiary bank.  The Policy Statement expressly provides that: "a parent company that receives a tax refund . . . obtains these funds as agent . . . [and that] an organization's tax allocation agreement . . . should not purport to characterize refunds attributable to a subsidiary depositary institution . . . as the property of the parent."  And in turn, the TSA in this case expressly provides that the parties intend their agreement to be in accordance with the Policy Statement.

---

[8]    Indeed the absence of provisions for interest and collateral might be more significant, in light of the fact that under 12 U.S.C. § 371c, banks are restricted in their ability to engage in certain transactions with affiliates—including issuing a loan or extension of credit without ensuring sufficient collateral protections.

14

Thus, we resolve the ambiguity within the four corners of the TSA itself by applying Georgia's rules of contract construction. We conclude that the parties to the instant TSA intended for NetBank to hold the tax refund it actually received—which was attributable solely to the Bank's losses—as agent for the Bank.

## C.

The relationship between NetBank and the Bank is not a debtor-creditor relationship with respect to the present request for an IRS refund for carryback tax losses attributable solely to the Bank. Rather, NetBank holds the refund as agent for the Bank. For these reasons, we reverse the district court's judgment and direct the court, on receipt of our mandate, to vacate its decision declaring the tax refunds the property of the bankruptcy estate and to enter judgment in favor of the FDIC.[9]

**REVERSED and REMANDED.**

---

[9] Having found that the TSA created an agency relationship, we need not address the FDIC's argument that NetBank's rejection of the TSA bars enforcement of the agreement.