COOK, J., delivered the opinion of the court, in which McKEAGUE, J., joined and GILMAN, J., joined except as to Part II.B. GILMAN, J. (pp. 538-40), delivered a separate concurring opinion.
OPINION
COOK, Circuit Judge.
This case presents the question of who owns a $170 million tax refund: a parent corporation that filed a consolidated tax return on behalf of its subsidiaries and to whom the IRS issued the refund, or the subsidiary whose net operating loss generated the refund. The answer depends on whether the parties had a debtor-creditor relationship — in which case the parent corporation owns the refund but with an obligation to repay the subsidiary — or an agency/trust relationship — in which case the subsidiary owns the refund, with the parent acting merely as an agent or trustee.
Appellee AmFin Financial Corporation (“AFC”), the parent of a group of banks that included AmTrust Bank (“AmTrust”), insists that a tax-sharing agreement (“TSA”) mandates that a $170 million tax refund (“Refund”) generated by AmTrust’s net losses belongs to AFC’s bankruptcy estate, and that AmTrust is merely another creditor of the estate. The district court agreed, holding that the TSA unambiguously allocated the Refund to the now-bankrupt AFC. Finding the TSA silent on this issue, we reverse and remand with instructions that the district court consider extrinsic evidence concerning the parties’ intent in light of Ohio agency and trust law.
I.
In 2006, AFC and its affiliates (“Affiliated Group”), including AmTrust, entered into the current TSA for the purpose of allocating tax liability. In November 2009, AFC filed for Chapter 11 bankruptcy protection, and, as part of that reorganization, the federal Office of Thrift Supervision closed AmTrust and placed it into FDIC receivership. See In re AmTrust Fin. Corp., 694 F.3d 741, 745-49 (6th Cir.2012). AFC later filed a consolidated 2008 tax return on behalf of the Affiliated Group showing a total net operating loss of $805 million, with AmTrust’s losses accounting for $767 million of the total. After AFC took the position that any refund would belong to its bankruptcy estate, the parties agreed by stipulation to deposit refunds in a segregated account pending full adjudication of the parties’ respective ownership claims. When the IRS issued the Affiliated Group’s $194,831,455 refund to AFC, it deposited the refund as agreed. The FDIC maintains that $170,409,422 of that refund, plus interest, belongs to AmTrust because that portion results solely from offsetting AmTrust’s 2008 net operating loss against its ineome in prior years. AFC concedes that AmTrust’s tax situation generated the Refund.
The FDIC filed a complaint seeking a declaratory judgment that AmTrust owns the Refund. The FDIC later moved to amend its complaint after uncovering new evidence regarding the parties’ intent as to the ownership of refunds. The district court denied this motion, granting AFC *533 judgment on the pleadings instead. Borrowing another court’s analysis of a different TSA, the district court reasoned that the TSA’s use of terms such as “reimbursement” and “payment” definitively established a debtor-creditor relationship between AFC and its subsidiaries as to tax refunds, thereby justifying the court’s awarding the Refund to AFC’s bankruptcy estate. Though the FDIC proffered extrinsic evidence showing that the parties intended to create an agency or trust relationship under Ohio law with respect to tax refunds, the district court declined to consider that evidence and rejected the FDIC’s trust and agency arguments without further analysis. The FDIC appeals.
II.
We review a district court’s judgment on the pleadings “using the same de novo standard of review employed for a motion to dismiss under Rule 12(b)(6).” Tucker v. Middleburg-Legacy Place, 539 F.3d 545, 549 (6th Cir.2008). “For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment.” JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581 (6th Cir.2007). We also give fresh review to a district court’s denial of a motion to amend a complaint on the basis of futility. Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 437 (6th Cir.2008).
Because the district court concluded that the TSA unambiguously allocated the Refund to AFC’s bankruptcy estate, we first consider the effect of that document.

A The Meaning of the TSA

Finding the TSA integrated and unambiguous, the district court concluded as a matter of law that it created a debtor-creditor relationship with respect to tax refunds between AFC and its affiliates, including AmTrust, and thus the Refund belonged to AFC’s bankruptcy estate. We review de novo “a district court’s conclusions regarding ambiguity in contract language.” Schachner v. Blue Cross & Blue Shield of Ohio, 77 F.3d 889, 893 (6th Cir.1996).

1. The Text of the TSA

The FDIC first argues that the TSA says nothing about who owns tax refunds issued to AFC in its role as filer of consolidated tax returns on behalf of the Affiliated Group.[1] The stated purpose of the TSA is to “specify the manner in which [the Affiliated Group] will share the Consolidated Tax Liability ... and the manner in which certain Tax Attributes ... are to be treated among the members of the Affiliated Group.” To that end, the TSA directs that “[e]ach Affiliate shall be responsible for and shall reimburse the Paying Entity for its share of the Affiliated Group’s Consolidated Tax liability.” Importantly, none of the TSA’s provisions addresses the disposition or ownership of a refund issued by the IRS to AFC in its capacity as parent of the Affiliated Group. Rather, in keeping with the TSA’s purpose, section two of the TSA allocates tax liability and requires members to timely pay their shares, and section three of the TSA allows members of the Affiliated Group to use other members’ net operating losses to reduce their tax liability.
*534 AFC claims that section four of the TSA applies here “[b]y requiring that members promptly ‘settle any amounts’ calculated by reference to the refund.” The relevant text reads:
4. Adjustment. In the event of any adjustment of the Consolidated Tax Liability of the Affiliated Group for any Consolidated Return year by reason of the filing of [a] ... loss carryback refund application, ... the respective liabilities of Common Parent and each Affiliate shall be redetermined hereunder after fully giving effect to any such adjustment, as if such adjustment had been part of the original computation; and the parties shall promptly settle any amounts owing among them.
This language, like the rest of the TSA, speaks only to the allocation of liability in the event of an adjustment such as a loss carryback refund. It says nothing about the ownership of such a refund, much less unambiguously establish AFC’s ownership of the Refund. We thus reject AFC’s argument that the text of the TSA supports its right to the Refund and agree with the FDIC that the TSA fails to address the ownership or disposition of refunds.

2. The District Court’s Analysis

For its part, the district court pointed to no particular provision to support its conclusion that the TSA unambiguously allocated the Refund to AFC, relying on another court’s analysis of an altogether different TSA instead. See In re IndyMac Bancorp, Inc., No. 2:08-bk-21752-BB, 2012 WL 1037481 (Bankr.C.D.Cal. Mar. 29, 2012) (report and recommendation), aff'd, 554 Fed.Appx. 668 (9th Cir.2014). That TSA “expressly authorize^] [the parent corporation], in its sole discretion, to determine whether any tax refunds to which the consolidated group is entitled will be paid or credited against future tax liabilities of the consolidated group.” Id. at *14 (internal quotation marks omitted). That agreement also “provided] for ‘payment’ or ‘reimbursement’ from [the parent corporation] to the [affiliate bank] under certain conditions if [the affiliate bank] suffer[ed] losses that would have entitled it to a refund had it filed separate tax returns.” Id. The TSA in IndyMac thus expressly stated the circumstances under which the parent corporation would disburse refunds to the group and gave the parent corporation discretion as to whether to distribute refunds at all. And in affirming, the Ninth Circuit explicitly referenced the fact that the TSA there “describes the process by which [the parent corporation] will allocate ... tax refunds” and “gives [the parent corporation] ‘sole discretion’ to determine the ‘means and manner’ of ... paying refunds.” Indy-Mac, 554 Fed.Appx. at 668.
Likewise, the TSAs in other cases cited by AFC include language directly addressing the distribution of refunds. See, e.g., In re Imperial Capital Bancorp, Inc., 492 B.R. 25, 30 (Bankr.S.D.Cal.2013); In re First Cent. Fin. Corp., 269 B.R. 481, 490 (Bankr.E.D.N.Y.2001). As no similar language appears in the TSA here, these cases offer AFC no support.

S. The BankUnited Decision

As pressed by the FDIC, the Eleventh Circuit persuasively rejected AFC’s refund-ownership position in a similar case, In re BankUnited Financial Corp., 727 F.3d 1100 (11th Cir.2013). Like the district court here, the BankUnited bankruptcy court held that the TSA’s use of terms such as “payables” and “receivables” evidenced the parties’ unambiguous intent that a bank’s parent company would retain tax refunds generated by the bank with only a debtor’s obligation to repay the bank. In re BankUnited Fin. Corp., 462 B.R. 885, 899-900 (Bankr.S.D.Fla.2011). *535 The Eleventh Circuit reversed, rejecting the bankruptcy court’s terminology-based rationale and holding that “[w]e find no words in the TSA from which it could reasonably be inferred that the parties agreed that the [parent company] would retain the tax refunds ... and ... be indebted to the [b]ank.” BankUnited, 727 F.3d at 1108. The court further explained that “[i]f ... the parties created a debtor-creditor relationship, we would expect to find ... protections] for the creditor [bank] that would help guarantee the debt- or [parent company’s] obligation, such as a fixed interest rate, a fixed maturity date, or the ability to accelerate payment upon default.” Id.
Just so here: The TSA says nothing about tax refunds received by AFC on behalf of the group and includes no protections for the putative creditor, as one would expect if the parties intended a debtor-creditor relationship. And, just like BankUnited, AFC’s straining to imbue the commonplace terms “payment” and “reimbursement” with specialized and unambiguous meaning falls flat. See Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 374 N.E.2d 146, 150 (1978) (“[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument.”).[2]
A Conclusion
In sum, nothing in the TSA evidences an unambiguous intent to create a debtor-creditor relationship and thereby allocate the refund to AFC. Moreover, persuasive case law supports our conclusion that the use of terms such as “reimbursement” and “payment” need not create a debtor-creditor relationship, especially when the TSA contains no provisions to protect the creditor subsidiary’s interest in the refund while it remains under AFC’s control. We therefore hold that the district court erred in granting AFC judgment on the pleadings and in disallowing the FDIC’s proffer of extrinsic evidence.

B. The Propriety of the Bob Richards Court’s Analysis

Finding the TSA ambiguous, we next consider the FDIC’s contention that we should apply the principle first enunciated in In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262, 265 (9th Cir.1973), that “[a]bsent any differing agreement!,] ... a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member.” According to the FDIC, the Refund belongs to AmTrust under this analysis.
But this court-created “rule” is a creature of federal common law, see In re NetBank, Inc., 729 F.3d 1344, 1347 n. 3 (11th Cir.2013), and, as AFC points out, federal common law constitutes “an unusual exercise of lawmaking which should be indulged only in a few restricted instances.” Cent. States, Se. & Sw. Areas Pension Fund v. Mahoning Nat’l Bank, 112 F.3d 252, 256 (6th Cir.1997) (internal quotation marks omitted) (quoting Milwaukee v. Illinois, 451 U.S. 304, 313, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981)). In particular, the Supreme Court instructs courts to invoke federal common law only when “there is a significant conflict between some federal policy or interest and the use of state law.” O’Melveny & Myers v. FDIC, 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).
*536 This case does not call for federal common law because our precedent recognizes that “[s]tate law determines whether [property is] excluded from the debtor’s estate.” In re Cannon, 277 F.3d 838, 849 (6th Cir.2002) (citing Barnhill v. Johnson, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); see also Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (“Congress has generally left the determination of property rights in the assets of a bankrupt’s estate to state law.”). If Congress generally allows state law to determine the property interests subject to bankruptcy, we cannot say that this situation constitutes one of the “few restricted instances” where federal common law “should be indulged.” See Cent. States, 112 F.3d at 256; see also United States v. Kimbell Foods, Inc., 440 U.S. 715, 729, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) (rejecting “generalized pleas for uniformity” absent “concrete evidence that adopting state law would adversely affect” federal interests).
The FDIC cites cases employing the Bob Richards analysis, but these courts bypassed the threshold question of whether federal common law should govern this issue. See, e.g., In re Prudential Lines Inc., 928 F.2d 565, 570-71 (2d Cir.1991); Capital Bancshares, Inc. v. FDIC, 957 F.2d 203, 208 (5th Cir.1992); In re Reveo D.S., Inc., 111 B.R. 631, 637 (Bankr.N.D.Ohio 1990). And other courts recognize that “[federal law does not govern the allocation of [a consolidated filing group’s] tax refunds.” BankUnited, 727 F.3d at 1102; see also NetBank, 729 F.3d at 1347 n. 3 (applying state law to determine ownership of a tax refund). Ohio law thus determines who owns the Refund.

C. Extrinsic Evidence of a Resulting Trust or Agency Relationship Under Ohio Law

Because the TSA says nothing about the ownership of refunds and we decline to apply federal common law, we agree with the FDIC’s alternative argument that the district court must look to the evidence of the parties’ intent unearthed during discovery. The FDIC contends that this evidence shows either a trust or agency relationship with respect to tax refunds, such that the Refund properly belongs to Am-Trust.[3] AFC lodges a number of objections to the consideration of this evidence. None has merit.

1. Resulting Trust

Under Ohio law, “a resulting trust is based on the parties’ intentions.” Brote v. Hurt, 174 Ohio App.3d 101, 880 N.E.2d 980, 985 (2007). “A resulting trust has been defined as one ... where the legal estate in property is transferred or acquired by one under facts and circumstances which indicate that the beneficial interest is not intended to be enjoyed by the holder of the legal title.” First Nat’l Bank of Cincinnati v. Tenney, 165 Ohio St. 513, 138 N.E.2d 15, 17 (1956) (internal quotation marks omitted). According to the FDIC, AFC and its affiliates intended *537 that AFC distribute tax refunds received on behalf of the Affiliated Group as though the companies had filed separate tax returns, with AFC holding no beneficial interest. AFC counters that there can be no trust as a matter of law for three reasons.
First, AFC makes much of the fact that the TSA contains no language evincing a trust relationship. But the FDIC never argued that the TSA created an express trust; rather, the FDIC urges the court to find an implied resulting trust.
Second, AFC cites In re Omegas Group, Inc. for the proposition that the Sixth Circuit recognizes no implied trusts in bankruptcy. 16 F.3d 1443 (6th Cir.1994). The Omegas Group court held that a constructive trust could not exclude property from a bankruptcy estate. Id. at 1451. The court reasoned that “[i]mposition of a constructive trust clearly thwarts the policy of ratable distribution” because “a constructive trust ... is a remedy [and] does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment ‘impressing’ defendant’s property.” Id. (internal citations omitted). AFC maintains that this reasoning applies with equal force to resulting trusts.
But resulting trusts, unlike constructive trusts, do not subvert the policy of ratable distribution. As explained by the Ninth Circuit Bankruptcy Appellate Panel:
[T]he bankruptcy policy of ratable distribution [is implicated] only in determining whether to impose a constructive trust, not in applying state law governing resulting trusts. Enforcement of a resulting trust differs from postpetition imposition of a constructive trust in two important respects. First, a resulting trust gives effect to the intent of the parties. As such, the circumstances in which it is effective are governed by the usual standards for establishing intent, and not by the “relatively undefined” equitable considerations that govern constructive trusts. Second, because a resulting trust merely gives effect to the original will of the parties, it is effective from the date of the original transfer, and does not undermine ratable distribution among creditors who possess similar legal rights as of the petition date.
In re Sale Guar. Corp., 220 B.R. 660, 667-68 (9th Cir. BAP 1998) (internal citations omitted); see also In re Cedar Funding, Inc., 408 B.R. 299, 314-15 (Bankr.N.D.Cal.2009) (“Because a resulting trust is a judicial recognition that the parties’ relationship is and was always intended to be that of trustee and beneficiary, not debtor and creditor, the trust property never belongs to the debtor and does not become part of the bankrupt’s estate.”).
This reasoning accords with our precedent clarifying the meaning and reach of Omegas Group. In In re McCafferty, we acknowledged that “the policy of ratable distribution would not be relevant where the property at issue was not subject to distribution to creditors.” 96 F.3d 192, 196 (6th Cir.1996) (citing Begier v. IRS, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)). Here, the FDIC says that the parties never intended refunds to belong to AFC in the first place. AFC’s reliance on Omegas Group therefore misses the mark.
Last, AFC notes that Ohio law “generally” recognizes resulting trusts in three situations: “(1) purchase-money trusts, (2) instances where an express trust does not exhaust the res given to the trustee, and (3) where express trusts fail, in whole or in part.” Univ. Hosps. of Cleveland, Inc. v. Lynch, 96 Ohio St.3d 118, 772 N.E.2d 105, 117 (2002). Because none of these situations presents itself, AFC insists that the FDIC’s trust theory cannot succeed. But the court in Lynch did not purport to set forth an exclusive list of recognizable resulting trusts. In *538 deed, Ohio courts frequently recognize resulting trusts in other situations. See, e.g., Woodward v. Kleese, No. 2007-T-0002, 2007 WL 2822753, at *5 (Ohio Ct.App. Sept. 28, 2007) (affirming imposition of resulting trust when circumstances showed transferred money was to be returned to the transferor upon request); Bell v. Straight, Inc., 707 F.Supp. 325, 329 (S.D.Ohio 1989) (recognizing viability of resulting-trust theory when plaintiffs alleged they contributed money to a charity for a specific purpose but the charity failed to use money for that purpose). These cases underscore the key resulting-trust inquiry: whether the parties intended the recipient of the property to also hold the beneficial interest.

2. Agency Relationship

The FDIC’s evidence might also establish an agency relationship. An agency-principal relationship exists in Ohio “when one party exercises the right of control over the actions of another, and those actions are directed toward the attainment of an objective which the former seeks.” Hanson v. Kynast, 24 Ohio St.3d 171, 494 N.E.2d 1091, 1094 (1986). AFC repeats its mantra that the court may not consider any extrinsic evidence because the TSA “governs tax matters[ ] and ... is unambiguous.” But as discussed above, the TSA says nothing concerning the disposition and ownership of Affiliated Group members’ shares of tax refunds. And Ohio law instructs that courts may consider extrinsic evidence if “the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning.” Huff v. First-Energy Corp., 130 Ohio St.3d 196, 957 N.E.2d 3, 7 (2011). “Consequently, regardless of the contract language, an agency relationship could have existed” between AFC and members of the Affiliated Group, depending on what the FDIC’s evidence shows. See Grigsby v. O.K. Travel, 118 Ohio App.3d 671, 693 N.E.2d 1142, 1144 (1997).
III.
For these reasons, we REVERSE and REMAND for proceedings consistent with this opinion.

. AFC presses that the FDIC never argued the TSA’s ambiguity until its reply brief. True, the FDIC’s principal brief never employs the term "ambiguous.” It does, however, repeatedly say that the TSA is silent as to who owns the Refund. (See, e.g., Appellant Br. at 36.)

. The parties agree that Ohio law controls where applicable.

. The FDIC asks us to review evidence not considered by the district court and conclude that AFC holds the Refund in trust for the benefit of AmTrust as a matter of law. But to decide this issue, the district court must examine "the facts and circumstances” to ascertain whether the parties intended that Am-Trust would hold the beneficial interest in the Refund. See Bilovocki v. Marimberga, 62 Ohio App.2d 169, 405 N.E.2d 337, 341 (1979). In the FDIC’s cited case, In re Golden Triangle Capital, the Ninth Circuit Bankruptcy Appeals Panel considered an appeal from the trial court’s grant of summary judgment. 171 B.R. 79, 81 (9th Cir. BAP 1994). Here, the district court, which declined the FDIC’s proffer of extrinsic evidence and granted AFC judgment on the pleadings, must assess the evidence in the first instance.