**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 29, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

In re:  UNITED WESTERN BANCORP,
INC.,

     Debtor.

------------------------------

SIMON E. RODRIGUEZ, in his capacity
as Chapter 7 Trustee for the bankruptcy
estate of United Western Bancorp, Inc.,

     Plaintiff - Appellant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as
Receiver for United Western Bank,

     Defendant - Appellee.

No. 17-1281
(D.C. No. 1:16-CV-02475-WJM)
(D. Colo.)

_____

**ORDER**
_____

Before **BRISCOE**, **SEYMOUR**, and **HOLMES**, Circuit Judges.
_____

This matter is before the court on the appellant's *Petition for Panel Rehearing and Motion for Clarification.* Upon consideration, the request for panel rehearing is granted in part and to the limited extent that footnote 3 of the original Opinion will be deleted. The *Petition* is otherwise denied, as is the motion to clarify. A copy of the revised version is

attached to this order. The clerk is directed to file the amended version of the Opinion effective the date of this order.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 29, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

In re:  UNITED WESTERN BANCORP,
INC.,

     Debtor.

------------------------------

SIMON E. RODRIGUEZ, in his capacity
as Chapter 7 Trustee for the bankruptcy
estate of United Western Bancorp, Inc.,

     Plaintiff - Appellant,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as
Receiver for United Western Bank,

     Defendant - Appellee.

No. 17-1281

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-02475-WJM)**

_____

Mark E. Haynes (Michael M. Lane, with him on the briefs), Ireland Stapleton Pryor &
Pascoe, P.C., Denver, Colorado, appearing for Appellant.

Joseph Brooks, Counsel (Colleen J. Boles, Assistant General Counsel, Kathryn R.
Norcross, Senior Counsel, and Michelle Ognibene, Counsel, on the brief), Federal
Deposit Insurance Corporation, Appellate Litigation, Arlington, Virginia, appearing for
Appellees.

_____

Before **BRISCOE**, **SEYMOUR**, and **HOLMES**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

This appeal, which arises out of a bankruptcy adversary proceeding, concerns the ownership of a federal tax refund. The tax refund was issued by the Internal Revenue Service (IRS) to United Western Bancorp, Inc. (UWBI), a thrift holding company that had, under the terms of a written "Tax Allocation Agreement," filed consolidated returns on behalf of itself and several subsidiary corporations. The tax refund was the result, however, of net operating losses incurred by United Western Bank (the Bank), one of UWBI's subsidiaries.

Simon Rodriguez, in his capacity as the Chapter 7 Trustee for the bankruptcy estate of UWBI, initiated this adversary proceeding against the Federal Deposit Insurance Corporation (FDIC), as receiver for the Bank, alleging that the tax refund was owned by UWBI and was thus part of the bankruptcy estate. The bankruptcy court agreed and entered summary judgment in favor of the Trustee. The FDIC appealed to the district court, which reversed the decision of the bankruptcy court. The Trustee now appeals from the district court's decision.

Exercising jurisdiction pursuant to 28 U.S.C. § 158(d)(1), we agree with the district court that the tax refund belongs to the FDIC, as receiver for the Bank. Consequently, we affirm the judgment of the district court and remand to the bankruptcy court for further proceedings.

# I

*a) UWBI and its affiliates*

UWBI is a Colorado corporation and a "unitary thrift [or bank] holding company." Aplt. App., Vol. I at 41. UWBI owned several affiliate subsidiaries, including the Bank. The Bank, UWBI's principal subsidiary, was headquartered in Denver and operated a community-based banking network that was comprised of eight banking locations and a loan servicing office.

*b) The Tax Allocation Agreement*

UWBI's affiliate subsidiaries were "members of an affiliated group . . . within the meaning of Section 1504(a) of the Internal Revenue Code of 1986." Id. at 41; see 26 U.S.C. § 1504(a). Beginning in 2004 and continuing thereafter, the affiliated group "file[d] . . . consolidated federal income tax returns." Aplt. App., Vol. I at 41.

On January 1, 2008, UWBI and its affiliate subsidiaries entered into a Tax Allocation Agreement (the Agreement).[1] The Agreement's preamble noted that the affiliates had previously filed, and intended to continue to file, "consolidated federal income tax return[s]." Id. The preamble further stated that "UWBI and the Affiliates desire[d] to establish a method for (i) allocating the consolidated tax liability of the Group among its members, (ii) reimbursing UWBI for the payment of such tax liability, and (iii) compensating each member of the Group for the use of its losses by any other member of the Group." Id.

---

[1] Prior to 2008, UWBI and its affiliates had filed taxes under similar, but not identical, written agreements. Aplt. App., Vol. I at 182.

3

The Agreement in turn, under Section A, entitled "General Rule – Federal,"

outlined how federal tax payments would be made:

1. Except as specifically set forth herein to the contrary, each Affiliate shall pay UWBI an amount equal to the federal income tax liability such Affiliate would have incurred were it to file a separate return (or, if appropriate, a consolidated return with its subsidiary affiliates). If a regulated first-tier Affiliate incurs a net operating loss or excess tax credits, the regulated Affiliate is entitled to a refund equal to the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with UWBI. Similar treatment is optional at UWBI discretion for nonregulated first-tier Affiliates. Any refund shall generally not exceed the amount claimed or received as a refund resulting from a carryback claim filed by UWBI. However, this shall not prevent UWBI from the ability to make a refund over the amount received or claimed as a refund or carryback, if in its sole discretion it believes such payment is in its best interest. Additionally, if part of [sic] all of an unused consolidated net operating loss, net capital loss, tax credit or similar type item is allocated to an Affiliate pursuant to Regulations Section 1.1502-21, and it is carried back, if utilized, or it is carried forward, whether or not utilized, to a year in which such Affiliate filed a separate income tax return or a consolidated federal income tax return with another group, any refund or reduction in tax liability arising from the carryback or carryforward shall be retained by such Affiliate and such item shall not enter into the calculation of liability to or from UWBI.

2. In essence, this Agreement requires that each first-tier subsidiary be treated as a separate taxpayer with UWBI merely being an intermediary between an Affiliate and the Internal Revenue Service ("IRS").

Id. The Agreement also, in Section C, included "specific policies designed to cover

certain factual scenarios" including, for example, "[c]haritable contributions." Id. at

42.

Section G of the Agreement stated that "[e]ach Affiliate hereby appoints

UWBI as its agent, as long as such Affiliate is a member of the UWBI group, for the

purpose of filing such consolidated Federal income tax returns for the UWBI group as UWBI may elect to file and making any election, application or taking any action in connection therewith on behalf of the Affiliates." Id. at 44. Each affiliate also, under Section G, "consent[ed] to the filing of any such returns and the making of any such elections and applications." Id.

Under Section H, entitled "Miscellaneous," the Agreement contained a provision regarding refunds from the IRS:

> In the event of any adjustment to the tax returns of the Group as filed (by reason of an amended return, claim for refund, or an audit by a taxing authority), the liability of the parties to this Agreement shall be re-determined to give effect to any such adjustment as if it had been made as part of the original computation of tax liability, and payments between the appropriate parties shall be made within 10 business days after any such payments are made or refunds are received, or, in the case of contested proceedings, within 10 business days after a final determination of the contest.

Id. (quoting § H.1).

Also under Section H, the Agreement stated, in pertinent part:

> The intent of this Agreement is to provide an equitable allocation of the tax liability of the Group among UWBI and the Affiliates. Any ambiguity in the interpretation hereof shall be resolved, with a view to effectuating such intent, in favor of any insured depository institution.

Id. at 45 (quoting § H.4).

*c) UWBI's filing of federal tax returns on behalf of the group*

UWBI proceeded, in accordance with the terms of the Agreement, to file federal income tax returns for the consolidated group. In doing so, "the tax liabilities

5

and tax benefits" were computed "on a separate-entity basis for each Affiliate," but UWBI ultimately filed one tax return "on a consolidated basis." Id. at 82.

For the tax year 2008, UWBI filed a federal income tax return for the affiliated group and reported that the Bank generated $34,397,709 in taxable income. The return indicated that UWBI itself did not generate taxable income in 2008.

In 2010, the Bank suffered at least $35,351,690 in losses. Based upon the Bank's 2010 net operating losses, UWBI, at some point in 2011, filed on behalf of the affiliated group a tax refund request of $4,846,625 to recover a portion of the taxes paid by the Bank on its 2008 taxable income.[2]

*d) Appointment of the FDIC as receiver for the Bank*

The Bank was a federally chartered savings and loan association. On January 21, 2011, the Office of Thrift Supervision (OTS) closed the Bank and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. Shortly thereafter, the FDIC notified the IRS of these events.

*e) UWBI's bankruptcy proceedings*

Because the Bank was UWBI's principal, if not sole, source of income, the Bank's receivership resulted in UWBI becoming insolvent. On March 2, 2012, UWBI filed a petition for Chapter 11 bankruptcy. As of that date, the tax refund request that UWBI filed in 2011 was still pending before the IRS.

---

[2] The Internal Revenue Code permits corporations to "carryback" net operating losses for up to two taxable years. See 26 U.S.C. § 172.

On August 30, 2012, the FDIC filed a proof of claim in UWBI's bankruptcy case in the aggregate amount of $4,847,000. The FDIC alleged that, as receiver for the Bank, it was entitled to the federal tax refund that was due and owing from the IRS to the affiliate group because the refund stemmed exclusively from the Bank's business loss carrybacks. The FDIC also alleged that its claim covered "potential fraudulent transfers or unlawful dividends, unearned insurance premiums to the extent that the source of the premium payments was the Bank, insurance proceeds paid under applicable insurance coverage for any such losses, and other protective claims." Id. at 62.

The bankruptcy case was converted to a Chapter 7 proceeding on April 15, 2013. Rodriguez was appointed as the Chapter 7 trustee for the bankruptcy estate.

*f) The adversary proceeding*

On April 16, 2014, the Trustee initiated this adversary proceeding by filing a complaint against the FDIC asserting three claims: (1) a claim for declaratory relief in the form of a determination that the tax refund was the property of the debtor rather than the FDIC, (2) a claim for turnover of the tax refund, pursuant to 11 U.S.C. § 542, to the extent the FDIC possessed the tax refund, and (3) an objection to the FDIC's proof of claim. The bankruptcy court subsequently authorized the tax refund to be deposited into the court's registry. On November 25, 2014, the FDIC filed a counterclaim alleging that the FDIC, as the receiver for and successor to the Bank, owned the tax refund.

7

On October 30, 2015, the parties filed cross motions for summary judgment. The FDIC argued that there was "no provision in the . . . Agreement that transfers ownership of the Bank-generated tax refunds to [UWBI], indicates that the Bank intended to transfer beneficial ownership of the tax refunds to [UWBI], or otherwise alters the widely recognized default rule regarding ownership of tax refunds by the entity in a consolidated tax group that generated those tax refunds." Aplt. App., Vol. I at 78. The FDIC also argued that "[e]ven if the anticipated tax refund is paid to [UWBI], [UWBI] acts as agent for the Affiliated Group and, therefore, would only hold bare legal title in the tax refund." Id. The Trustee argued, in contrast, that the Agreement "establishe[d] a debtor-creditor relationship between [UWBI] and the Bank with respect to any tax refunds" and that "[i]f and when the Refund [wa]s paid to UWBI the funds w[ould] therefore become property of the [bankruptcy] Estate and [the FDIC] w[ould] have an unsecured, nonpriority claim for its pro rata share." Id. at 178.

In 2015, the IRS, after completing an audit, issued a refund in the amount of $4,081,334.67.

On September 16, 2016, the bankruptcy court issued an opinion and order granting summary judgment in favor of the Trustee and denying the FDIC's motion for summary judgment. In doing so, the bankruptcy court began by noting that 11 U.S.C. § 541 outlines the creation of a bankruptcy estate and provides, in pertinent part, that the estate includes "'all legal or equitable interests of the debtor in property as of the commencement of the case . . . wherever located and by whomever held.'"

8

Aplt. App., Vol. II at 382 (quoting § 541(a)). The bankruptcy court also noted that "[a] long line of bankruptcy cases (even pre-dating the modern Bankruptcy Code) dictate that if a debtor owns or is entitled to a federal loss carryback tax refund, such refund generally becomes property of the debtor's bankruptcy estate." Id. at 383.

The bankruptcy court concluded that the Agreement, "the Internal Revenue Code, and the IRS regulations all dictate that [UWBI], as the bank holding company for the Affiliated Group has *at least bare legal title* to the Tax Refund." Id. at 386 (emphasis in original). "After all," the bankruptcy court noted, "26 C.F.R. § 1.1502-77(d)(5) requires that the Tax Refund be made 'directly to and in the name of' [UWBI]." Id.

The bankruptcy court in turn concluded that the FDIC failed to establish that the Bank had equitable ownership of the Tax Refund. In support of this conclusion, the bankruptcy court noted that "neither the Internal Revenue Code nor the IRS regulations establish which entity, [UWBI] or the Bank, has equitable or beneficial ownership of the Tax Refund." Id.

The bankruptcy court also determined that the Agreement created a debtor-creditor relationship between UWBI and the Bank with respect to the tax refund. In particular, the bankruptcy court concluded that the Agreement (a) "created fungible payment obligations through an intercompany account of payments and reimbursements" that indicated "the parties were creating a debtor-creditor relationship," (b) contains no escrow, segregation, or use restrictions regarding what UWBI can or cannot do when it receives a tax refund from the IRS, and (c) delegates

9

decision-making on tax matters to UWBI. Id. at 390. Consequently, the bankruptcy court concluded that UWBI was "the beneficial owner of the Tax Refunds," and thus the Tax Refund "belong[ed] to the Trustee (as Trustee of the [UWBI] bankruptcy estate)." Id.

Based upon these conclusions, the bankruptcy court determined "that the Trustee [wa]s entitled to the Tax Refund." Id. at 400. The bankruptcy court emphasized that this "d[id] not leave the FDIC without a remedy" because it was "still a general unsecured creditor of the [UWBI] bankruptcy estate and [could] share *pari passu* with any other allowed general unsecured claims." Id. at 400-01.

The bankruptcy court entered judgment in the adversary proceeding on September 16, 2016.

### g) The district court's decision

The FDIC appealed and, on July 10, 2017, the district court issued an order reversing the judgment of the bankruptcy court. The district court concluded, in pertinent part, that the Agreement was "ambiguous regarding whether [UWBI] may keep the tax refund in the present circumstances" and "that any ambiguity [should] be construed in favor of the Bank." Aplt. App., Vol. III at 529. The district court noted that the plain language of Section A.2 of the Agreement "declare[d] that the purpose of the [Agreement] is to set up an arrangement in which [UWBI] acts as nothing more than a go-between, as between the subsidiaries and the IRS." Id. at 552. The district court also concluded that Section H.4 of the Agreement required it to construe any ambiguities in favor of the Bank and that, consequently, it was required to

10

interpret the Agreement as requiring UWBI "to act as agent on behalf of the Bank in obtaining and remitting the refund." Id. at 559. Accordingly, the district court concluded that UWBI "held no more than legal title to the Refund, while the Bank held equitable title," and thus "[t]he Refund [wa]s not part of [UWBI's] bankruptcy estate." Id. at 560.

The Trustee now appeals from the district court's decision.

II

*The Trustee's arguments on appeal*

The Trustee argues that under "[t]he plain language" of the Agreement, "UWBI holds equitable title to the Tax Refund, and thus . . . the Refund is property of the UWBI estate." Aplt. Br. at 12. In support, the Trustee asserts that the Agreement "imposes two reciprocal obligations." Id. He contends that "[i]t requires each affiliate to pay to UWBI funds equal to the amount the affiliate would have been liable to pay the IRS had the affiliate filed an individual . . . tax return," and it in turn "obliges UWBI to pay each affiliate funds equal to the amount of the refund to which that affiliate would have been entitled had it filed a separate tax return." Id. at 12-13. Further, the Trustee argues that "[n]othing in the [Agreement] grants [the Bank] any interest in any IRS tax refund actually received by UWBI." Id. at 13. In short, the Trustee argues, the Agreement "creates a debtor-creditor relationship, and the Bank holds only an unsecured claim against the UWBI estate in the amount of funds the Bank would have received had it filed a separate tax return." Id. at 14.

11

*Standard of review*

"When hearing an appeal from a district court's review of a bankruptcy-court order, 'we independently review the bankruptcy court's decision, applying the same standard as the . . . district court.'" In re Peeples, 880 F.3d 1207, 1212 (10th Cir. 2018) (quoting In re C.W. Min. Co., 798 F.3d 983, 986 (10th Cir. 2015)). "We review bankruptcy-court orders granting summary judgment in adversarial proceedings de novo, and affirm if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)).

*The scope of UWBI's bankruptcy estate*

It is well established that "[f]iling for Chapter 11 [or Chapter 7] bankruptcy has several relevant legal consequences," the most important of which, for purposes of this appeal, is that "an estate is created comprising all property of the debtor." Czyzewski v. Jevic Holding Corp., 137 S. Ct. 973, 978 (2017) (citing 11 U.S.C. § 541(a)(1)). This includes "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case." 11 U.S.C. § 541(a)(1). The estate does not include, however, "[p]roperty in which the debtor holds, as of the commencement of the [bankruptcy] case, only legal title and not an equitable interest . . . ." 11 U.S.C. § 541(d). Thus, in order for the tax refund to be considered part of UWBI's estate, UWBI must hold both legal and equitable title to the tax refund.

*The analytical framework for resolving ownership of the tax refund*

Section 1501 of the Internal Revenue Code (the Code) authorizes an "affiliated group" of corporations to "mak[e] a consolidated return with respect to income tax . . . ." 26 U.S.C. § 1501. The Code defines the term "affiliated group" to mean, in pertinent part, "1 or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation . . . ." 26 U.S.C. § 1504(a)(1)(A). The Code does not, however, specify what happens when an affiliated group that has filed a consolidated federal tax return receives a tax refund. More specifically, the Code is silent with respect to the legal and equitable ownership of such a tax refund.

Federal common law, however, provides a framework for resolving this issue. The general rule in this circuit, as outlined in <u>Barnes v. Harris</u>, 783 F.3d 1185, 1195 (10th Cir. 2015), is that "a tax refund due from a joint return generally belongs to the company responsible for the losses that form the basis of the refund." In adopting this principle, <u>Barnes</u> cited to and effectively adopted the Ninth Circuit's decision in <u>In re Bob Richards Chrysler-Plymouth Corp., Inc.</u>, 473 F.2d 262, 265 (9th Cir. 1973).[3]

---

[3] In <u>Fed. Deposit Ins. Corp. v. AmFin Fin. Corp.</u>, 757 F.3d 530 (6th Cir. 2014), the Sixth Circuit declined to adopt the <u>Bob Richards</u> rule on the grounds that it "is a creature of federal common law" and that "federal common law constitutes an unusual exercise of lawmaking which should be indulged only in a few restricted instances." <u>Id.</u> at 535. Whether or not this is a valid criticism, we are bound by the decision in <u>Barnes</u>.

13

Bob Richards involved facts somewhat similar, but not identical, to those at issue here. Western Dealer Management, Inc. (WDM) was a parent corporation that wholly owned two subsidiary corporations, one of which was Bob Richards Chrysler-Plymouth Corporation, Inc. (Bob Richards). In October 1965, Bob Richards filed a petition in bankruptcy. While that bankruptcy proceeding was pending, WDM filed consolidated federal income tax returns on behalf of itself and its two subsidiaries for the tax years 1965 and 1966. Notably, "[t]he return for 1966 showed that the consolidated group was entitled to a refund of taxes" in the amount of $10,063.25 and "[t]he entire refund . . . was due to the earnings history of" Bob Richards. Id. at 263. The bankruptcy trustee claimed that the refund belonged to the bankruptcy estate, but WDM claimed a right to the entire tax refund "as a set-off" of a "$45,000 unsecured obligation of" Bob Richards. Id.

The Ninth Circuit concluded that "[t]he Trustee, not WDM, [wa]s entitled to the refund." Id. at 264. In reaching this conclusion, the Ninth Circuit first "note[d] that at the date of the filing of the petition in bankruptcy, the Trustee acquired any interest [Bob Richards] had in the carryback tax refund." Id. The Ninth Circuit in turn noted there was "no evidence that [Bob Richards] or the Trustee at any time voluntarily assigned its rights in the refund to WDM." Id. Although the Ninth Circuit acknowledged that Bob Richards "consented to the filing of a consolidated tax return," it noted that "such consent [could not] be construed to include the transfer of a valuable asset without further consideration." Id.

14

Relatedly, the Ninth Circuit noted "that there is nothing in the [Internal Revenue] Code or Regulations that compels the conclusion that a tax saving must or should inure to the benefit of the parent company or of the company which has sustained the loss that makes possible the tax saving." Id. (quotations and brackets omitted). Thus, the Ninth Circuit noted, the normal rule is that "where there is an explicit agreement, or where an agreement can fairly be implied, as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability." Id. In the case before it, however, "the parties made no agreement concerning the ultimate disposition of the tax refund." Id. at 265.

All of which led the Ninth Circuit to adopt what has since become known as "the Bob Richards rule":

> Absent any differing agreement we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member. Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.

Id.

Applying these principles to the facts before it, the Ninth Circuit emphasized that "WDM received the tax refund from the government only in its capacity as agent for the consolidated group." Id. And because "there [wa]s no express or implied agreement that the agent had any right to keep the refund," it concluded "that WDM was acting as a trustee of a specific trust and was under a duty to return the tax refund to the estate of the bankrupt." Id.

15

The Trustee argues that <u>Barnes</u> and <u>Bob Richards</u> are inapplicable here because of the existence of the Agreement. But the Trustee is only partially correct. <u>Barnes</u>, which adopted <u>Bob Richards</u>, clearly applies to this case and outlines the general framework that we must apply in resolving the parties' dispute. The Trustee is correct, however, that this case differs from <u>Barnes</u> and <u>Bob Richards</u> because there was a written agreement in place—the Agreement—that discussed the filing of a consolidated federal tax return. Consequently, as directed by <u>Barnes</u> and <u>Bob Richards</u>, we must look to the terms of the Agreement and, taking into account Colorado case law, decide whether it unambiguously addresses how tax refunds are to be handled and, if so, whether it purports to deviate from the general rule outlined in <u>Barnes</u> and <u>Bob Richards</u>. <u>See generally</u> <u>Barnhill v. Johnson</u>, 503 U.S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law." (quotations omitted)).

*What does the Agreement say about tax refunds?*

As we shall explain, the written terms of the Agreement are, at best, ambiguous regarding the nature of the relationship that UWBI and the Bank intended to create with one another. Specifically, certain of its provisions suggest the existence of an agency relationship, while other provisions suggest the intent to create something other than an agency relationship.

As noted, Section A.1 of the Agreement, which is contained under the heading "General Rule – Federal," provides, in pertinent part:

16

If a regulated first-tier Affiliate incurs a net operating loss or excess tax credits, the regulated Affiliate is entitled to a refund equal to the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with UWBI. Similar treatment is optional at UWBI discretion for nonregulated first-tier Affiliates. Any refund shall generally not exceed the amount claimed or received as a refund resulting from a carryback claim filed by UWBI. However, this shall not prevent UWBI from the ability to make a refund over the amount received or claimed as a refund or carryback, if in its sole discretion it believes such payment is in its best interest. Additionally, if part of [sic] all of an unused consolidated net operating loss, net capital loss, tax credit or similar type item is allocated to an Affiliate pursuant to Regulations Section 1.1502-21, and it is carried back, if utilized, or it is carried forward, whether or not utilized, to a year in which such Affiliate filed a separate income tax return or a consolidated federal income tax return with another group, any refund or reduction in tax liability arising from the carryback or carryforward shall be retained by such Affiliate and such item shall not enter into the calculation of liability to or from UWBI.

Aplt. App., Vol. I at 41.

The first of these sentences—stating that "[i]f a regulated first-tier Affiliate," i.e., the Bank, "incurs a net operating loss or excess tax credits, the regulated Affiliate is entitled to a refund equal to the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with USBI"—is arguably ambiguous. On the one hand, it purports to "entitle[]" the regulated affiliate "to a refund equal to the amount that it would have received had it not joined in the filing of a consolidated return." On the other hand, when contrasted with the last sentence, it does not give the Bank the right to "retain" the refund. Instead, under the first sentence, a refund received by UWBI as a result of a net operating loss incurred by the Bank is taken into account by the parties in calculating their year-end liabilities to each other.

17

The second and third sentences of Section A.1 afford UWBI with two types of discretion: (1) whether to pay any refund at all to a nonregulated affiliate; and (2) when it pays a refund to any affiliate, whether to pay an amount equivalent to the amount the affiliate would have received had it filed its own income tax return, or instead to pay a greater amount. These sentences thus arguably point toward something more than a mere agency relationship.

The last sentence of Section A.1 indicates that if a net operating loss of any affiliate is carried back to a year when that affiliate was filing a separate income tax return (or filing a consolidated return with another group), then "any refund . . . shall be retained by such Affiliate and such item will not enter into the calculation of liability to or from UWBI." This arguably suggests that, in all other situations, an affiliate does not "retain" a tax refund and, instead, refunds are taken into consideration during the annual reconciliation of liability between the parties.

Section A.2 of the Agreement, which is also contained under the heading "General Rule – Federal," states: "In essence, this Agreement requires that each first-tier subsidiary be treated as a separate taxpayer with UWBI merely being an intermediary between an Affiliate and the Internal Revenue Service . . . ." Id. Although the term "intermediary" is not expressly defined in the Agreement, it is commonly understood to mean "[a] mediator or go-between." *Intermediary*, Black's Law Dictionary (10th ed. 2014). Thus, in contrast to most of Section A.1, Section A.2 clearly points to the existence of an agency relationship between UWBI and its

18

affiliates, rather than a debtor/creditor relationship. In other words, it suggests that UWBI will simply act as a conduit through which the refund will pass.

Section F of the Agreement, entitled "Tax Settlement Payments – Federal and State," states, in pertinent part, that affiliates are to make "[e]stimated payments of Federal . . . taxes" to UWBI on a specified quarterly basis (April 15, June 15, September 15, and December 15). Id. at 44. Those estimated payments are to be in "an amount equal to the amount of any estimated federal income taxes which the Affiliate would have been required to pay on or before such dates if the Affiliate had filed its own separate income tax return for such taxable period." Id. "Payments [by UWBI] to an Affiliate for net operating losses or similar items shall not be made under this provision, but rather on an annual basis pursuant to Section A" of the Agreement. Id.

In turn, Section E of the Agreement, entitled "Tax Settlement Payments – Federal," provides in pertinent part:

> 1. Preliminary tax settlement payments are due on or before March 15 following the end of the appropriate taxable year. Although overpayments of estimated taxes made by Affiliates are not refunded until final tax settlement is done, an Affiliate with a taxable loss for the year may recover estimated taxes paid for that year before final settlement if an "expedited refund" claim is filed with UWBI by February 15 following the end of the tax year.

> 2. Each first-tier Affiliate shall compute its final tax settlement liability based on the amounts included for that Affiliate (and its subsidiaries, if applicable) in the consolidated federal income tax return filed. A copy of such computation will be prepared by October 31, and any differences will be resolved. Final tax settlement payments or refunds are due on or before November 15.

Id. at 43-44.

Considered together, Sections E and F obligate affiliates to make quarterly estimated tax payments to UWBI during the course of a taxable year, preliminary tax settlement payments to UWBI on or before March 15th following the end of the taxable year, and final tax settlement payments, if necessary, to UWBI on or before November 15th following the end of the taxable year. In turn, Section E, when considered together with Section A, obligates UWBI to (1) refund to its affiliates, by November 15th following the end of the taxable year, any overpayments of estimated taxes, (2) expedite any such refund if an affiliate has a taxable loss for the year in question and the affiliate files with UWBI an expedited refund claim by February 15th following the end of the taxable year, and (3) ensure that, when a regulated first-tier affiliate incurs a net operating loss or excess tax credits, any such refunds paid to that affiliate are equal to or greater than the amount that such affiliate would have been entitled to receive had it not joined in the filing of the consolidated tax return.

Section G of the Agreement states that "[e]ach Affiliate hereby appoints UWBI as its agent . . . for the purpose of filing such consolidated Federal income tax returns for the UWBI group as UWBI may elect to file and making any election, application, or taking any action in connection therewith on behalf of the Affiliates." Id. at 44.

Lastly, Section H of the Agreement, entitled "Miscellaneous," contains two relevant paragraphs. Section H.1 states:

20

In the event of any adjustment to the tax returns of the Group as filed (by reason of an amended return, claim for refund, or an audit by a taxing authority), the liability of the parties to this Agreement shall be re-determined to give effect to any such adjustment as if it had been made as part of the original computation of tax liability, and payments between the appropriate parties shall be made within 10 business days after any such payments are made or refunds are received, or, in the case of contested proceedings, within 10 business days after a final determination of the contest.

Id. Further, Subsection H.4 states, in pertinent part:

The intent of this Agreement is to provide an equitable allocation of the tax liability of the Group among UWBI and the Affiliates. Any ambiguity in the interpretation hereof shall be resolved, with a view to effectuating such intent, in favor of any insured depository institution.

Id. at 45.

Considered in its entirety, it is apparent that the Agreement was intended to authorize the filing of a consolidated tax return and, in turn, to create a series of payment obligations between UWBI and its affiliates—including the Bank—in order to carry out the goal of filing a consolidated tax return. Affiliates are obligated, by way of both estimated and final tax payments, to pay UWBI the precise amount of their federal income tax obligations. UWBI, in turn, is obligated to refund to its affiliates any overpayments of estimated taxes. When an affiliate incurs a taxable loss due to net operating losses or excess tax credits, UWBI's obligations depend upon the nature of the affiliate. If the affiliate is a regulated, first-tier affiliate such as the Bank, then UWBI is obligated to pay that affiliate "a refund equal to" or greater than "the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with UWBI." Id. at 41 (§ A.1 of the

21

Agreement). For "nonregulated first-tier Affiliates," UWBI has the discretion to decide whether or not to treat them similarly to regulated first-tier affiliates in terms of tax refunds. Id.

Critically, however, the Agreement is, on its face, ambiguous with respect to the type of relationship it intends to create between UWBI and regulated, first-tier affiliates, such as the Bank, regarding the ownership of refunds from the IRS. [4] See Pinnacol Assurance v. Hoff, 375 P.3d 1214, 1229 (Colo. 2016) (noting that a contract is ambiguous if it is reasonably susceptible of more than one meaning); id. ("Whether a written contract is ambiguous is a question of law that we review de novo."). On the one hand, portions of the Agreement quite clearly indicate the intent to create an agency relationship between UWBI and its regulated, first-tier affiliates. For example, Section A.2 states that "each first-tier subsidiary [is to] be treated as a separate taxpayer with UWBI merely being an intermediary between an Affiliate and the" IRS. Aplt. App., Vol. I at 41. Likewise, Section G states that UWBI is being appointed by each affiliate to act as its agent for purposes of filing the consolidated tax return and taking any action in connection therewith. On the other hand, portions of the Agreement arguably suggest the intent for UWBI to retain tax refunds before forwarding them on to regulated, first-tier affiliates. For example, parts of Section

---

[4] Rodriguez argues the FDIC has waived any argument that the Agreement is ambiguous. We reject that argument. The FDIC has consistently argued the Agreement creates an agency relationship, rather than a debtor/creditor relationship. The FDIC has also consistently argued that any ambiguity in the Agreement must be resolved in the Bank's favor. Aplt. App., Vol. I at 89, 237; Vol. III at 423, 434, 452, 453, 500, 520-21.

A.1 imply that UWBI will retain tax refunds and then later take them into account during the annual settlement process. In addition, the fact that Section A.1 affords UWBI with discretion regarding the amount to refund a regulated, first-tier affiliate (i.e, the exact amount of the refund or a greater amount) seems to suggest something other than an agency relationship. Finally, the ambiguity of the Agreement on this issue is compounded by the fact that it contains no language requiring UWBI to utilize a trust or escrow for tax refunds—which would suggest the existence of an agency or trust relationship—nor does it contain provisions for interest and collateral—which would be indicative of a debtor-creditor relationship. See In re NetBank, Inc., 729 F.3d 1344, 1351 (11th Cir. 2013); Fed. Deposit Ins. Corp. v. AmFin Fin. Corp., 757 F.3d 530, 535 (6th Cir. 2014).

*Resolving the Agreement's ambiguity*

Notably, the Agreement itself provides a method for resolving the ambiguity. Section H.4 of the Agreement states that "[a]ny ambiguity in the interpretation hereof shall be resolved, with a view to effectuating such intent [i.e., to provide an equitable allocation of the tax liability of the Group among UWBI and the Affiliates], in favor of any insured depository institution." Aplt. App., Vol. I at 45. Quite clearly, construing the Agreement to create an agency relationship between UWBI and the Bank with respect to federal tax refunds—and thereby affording ownership of the tax refund to the Bank—is more favorable to the Bank than construing the Agreement to create a debtor/creditor relationship and thus affording ownership of federal tax refunds to UWBI. We therefore conclude that the ambiguity in the Agreement must

23

be construed in favor of the Bank and the FDIC, and that, consequently, the Agreement must be read as creating only an agency relationship between UWBI and the Bank.

*Conclusion*

In sum, we conclude that the Agreement creates an agency relationship between UWBI and the Bank and that, consequently, the Agreement's intended treatment of tax refunds does not differ from the general rule outlined in <u>Barnes</u> and <u>Bob Richards</u>. Therefore, we conclude that the tax refund at issue belongs to the Bank, and that the FDIC, as receiver for the Bank, was entitled to summary judgment in its favor.

## III

We AFFIRM the judgment of the district court and REMAND to the bankruptcy court for further proceedings consistent with this opinion.