**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 26, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

In re:  UNITED WESTERN BANCORP,
INC.,

     Debtor.

------------------------------

SIMON E. RODRIGUEZ, in his capacity
as Chapter 7 Trustee for the bankruptcy
estate of United Western Bancorp, Inc.,

     Plaintiff - Appellant,

v.

No. 17-1281

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its capacity as
Receiver for United Western Bank,

     Defendant - Appellee.
_____

**On Remand from the United States Supreme Court**
**(S. Ct. No. 18-1269)**
**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-02475-WJM)**
_____

Submitted on the briefs:[*]

Neal Kumar Katyal and Mitchell P. Reich, Hogan Lovells US LLP, Washington, DC; Thomas P. Schmidt, Hogan Lovells US LLP, New York, New York; and Mark E. Haynes, Ireland Stapleton Pryor & Pascoe, P.C., Denver, Colorado, for Appellants.

Colleen J. Boles, Assistant General Counsel, J. Scott Watson, Senior Counsel, and Joseph Brooks, Counsel, Federal Deposit Insurance Corporation, Arlington, Virginia, for Appellees.

_____

Before **BRISCOE**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

This matter is before us upon remand from the Supreme Court. *See Rodriguez v. Fed. Deposit Ins. Corp.*, —— U.S. ––––, 140 S. Ct. 713, 206 L. Ed.2d 62 (2020). Having ordered and considered supplemental briefing from the parties, we conclude, applying Colorado state law, that the Federal Deposit Insurance Corporation (FDIC), as receiver for United Western Bank (the Bank), is the owner of the federal tax refund that gave rise to this adversary proceeding. Consequently, we affirm the judgment of the district court and remand to the bankruptcy court for further proceedings.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

# I

Two entities claim ownership of the federal tax refund that lies at the heart of this case. The first is United Western Bancorp, Inc. (UWBI). UWBI is a thrift holding company that has filed for bankruptcy. UWBI's bankruptcy estate is overseen by bankruptcy trustee Simon Rodriguez. The second entity claiming ownership of the tax refund is the Bank, which is a subsidiary of UWBI. The Bank has also endured financial troubles and is currently in receivership overseen by the FDIC.

In 2008, prior to their financial troubles, UWBI, the Bank, and UWBI's other affiliate subsidiaries entered into a Tax Allocation Agreement (the Agreement). Under the terms of the Agreement, UWBI filed consolidated tax returns in 2008, 2009, and 2010 on behalf of itself and its subsidiaries. Although the 2008 return reported positive net income, the 2009 and 2010 returns reported losses, the great bulk of which were derived from net operating losses incurred by the Bank. UWBI sought a loss-carryback from the Internal Revenue Service (IRS) to offset the 2009 and 2010 consolidated losses against the 2008 gains.

In 2011, the Bank was placed into receivership and UWBI filed for bankruptcy. After UWBI filed for bankruptcy, the IRS issued UWBI a tax refund in the amount of $4,081,334. The bankruptcy trustee and the FDIC both claimed ownership of the refund.

3

II

The bankruptcy trustee initiated this adversary proceeding against the FDIC, seeking a resolution of the dispute over the ownership of the tax refund. The bankruptcy court entered summary judgment in favor of the trustee, concluding that the tax refund was owed by UWBI and was thus part of the bankruptcy estate. The FDIC appealed to the district court, which reversed the decision of the bankruptcy court. The bankruptcy trustee then appealed to this court.

We agreed with the district court that the tax refund belonged to the Bank. In arriving at this conclusion, we noted that the Tenth Circuit had previously adopted a rule of federal common law, known as the *Bob Richards* rule, that held that, in the absence of a tax allocation agreement that provides otherwise, "'a tax refund due from a joint return generally belongs to the company responsible for the losses that form the basis of the refund.'"[1] *In re United Western Bancorp, Inc.*, 914 F.3d 1262, 1269 (10th Cir. 2019) (quoting *Barnes v. Harris*, 783 F.3d 1185, 1195 (10th Cir. 2015)). Applying this federal rule of common law, we examined the terms of the Agreement to determine whether the Agreement "unambiguously addresse[d] how tax refunds [we]re to be handled and, if so, whether it purport[ed] to deviate from the general rule outlined in *Barnes*." *Id.* at 1270. We "conclude[d] that the Agreement create[d] an agency relationship between UWBI and the Bank and that, consequently,

---

[1] The "*Bob Richards* rule" originated in a Ninth Circuit case of the same name. *See In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262, 265 (9th Cir. 1973).

the Agreement's intended treatment of tax refunds d[id] not differ from the general rule outlined in *Barnes*." *Id.* at 1274. "Therefore, we conclude[d] that the tax refund at issue belong[ed] to the Bank, and that the FDIC, as receiver for the Bank, was entitled to summary judgment in its favor." *Id.*

The bankruptcy trustee filed a petition for writ of certiorari. The Supreme Court granted review to determine the narrow question of whether the ownership dispute over the tax refund should be resolved based upon federal common law, i.e., the Ninth Circuit's *Bob Richards* rule that was adopted by this court in *Barnes*, or, instead, upon "state law, together with any applicable federal rules." *Rodriguez*, 140 S. Ct. at 716. More specifically, the Supreme Court, by its own admission, "took th[e] case to decide *Bob Richards*'s fate." *Id.* at 717. The Supreme Court, in addressing this question, emphasized that "before federal judges may claim a new area for common lawmaking, strict conditions must be satisfied," one of which is that, "[i]n the absence of congressional authorization, common lawmaking must be necessary to protect uniquely federal interests." *Id.* (quotations omitted). The Court concluded that "[n]othing like that exists here" because the federal government has no "unique interest . . . in determining how a consolidated corporate tax refund, once paid to a designated agent, is distributed among group members."[2] *Id.* at 717-18

---

[2] Notably, the FDIC, "which advocated for the *Bob Richards* rule" before us, reversed course in the Supreme Court and "expressly conced[ed] that federal courts 'should not apply a federal common law rule to . . . put a thumb on . . . the scale' when deciding which corporate group member owns some or all of a consolidated refund." 140 S. Ct. at 718 (quoting Tr. of Oral Arg. 40).

(emphasis and question mark omitted). The Court in turn observed that "state law is well equipped to handle disputes involving corporate property rights." *Id.* at 718. Ultimately, the Court concluded that our "reliance on *Bob Richards*'s analytical framework was mistaken," and it remanded the case to us for further consideration. *Id.* In doing so, the Court noted that "[w]hether this case might yield the same or a different result without *Bob Richards* is a matter the court of appeals may consider on remand." *Id.* Although the FDIC suggested that the Supreme Court could affirm on the basis of our analysis of the Agreement under Colorado state law, the Court declined to consider that suggestion, noting that it "took th[e] case only to" address the propriety of the *Bob Richards* rule. *Id.*

After we received the Court's decision, we directed the parties to file supplemental briefs. That briefing is now complete.

## III

The question before us on remand remains the same as before: who owns the federal tax refund? As directed by the Supreme Court, we look to Colorado state law to resolve this question.

Under Colorado law, "[c]ontract interpretation presents a question of law that we review de novo." *Klun v. Klun*, 442 P.3d 88, 92 (Colo. 2019). "In construing a contract, our primary goal is to determine and give effect to the intent of the parties." *Id.* The intent of the parties is determined "primarily from the language of the instrument itself." *Id.* "When a written contract is complete and free from ambiguity, we will deem it to express the intent of the parties, and we will enforce it

6

according to its plain language." *Id.* "In ascertaining whether provisions of an agreement are ambiguous, we review the instrument's language and construe it consistent with the plain and generally accepted meaning of the words employed." *Id.* "Terms used in a contract are ambiguous when they are susceptible of more than one reasonable interpretation." *Id.*

Notably, we did not ignore Colorado law in our original decision. Indeed, in the course of applying the *Bob Richards* rule, we "look[ed] to the terms of the Agreement and, taking into account Colorado case law, decide[d] whether [the Agreement] unambiguously addresse[d] how tax refunds [we]re to be handled." *In re United Western Bancorp*, 914 F.3d at 1270. Our original construction of the Agreement now bears repeating because, whether or not it remains the law of the case[3], we continue to agree with it:

> [T]he written terms of the Agreement are, at best, ambiguous regarding the nature of the relationship that UWBI and the Bank intended to create with one another. Specifically, certain of its provisions suggest the existence of an agency relationship, while other provisions suggest the intent to create something other than an agency relationship.
>
> As noted, Section A.1 of the Agreement, which is contained under the heading "General Rule — Federal," provides, in pertinent part:
>
> > If a regulated first-tier Affiliate incurs a net operating loss or excess tax credits, the regulated Affiliate is entitled to a refund equal to the amount that it would have been entitled to receive had it not joined in the filing of a consolidated

---

[3] The parties dispute whether the law-of-the-case doctrine applies here. We need not resolve that dispute because, even if it does not, we would reach the same outcome because we continue to find our state-law reasoning from the original decision persuasive.

7

return with UWBI. Similar treatment is optional at UWBI discretion for nonregulated first-tier Affiliates. Any refund shall generally not exceed the amount claimed or received as a refund resulting from a carryback claim filed by UWBI. However, this shall not prevent UWBI from the ability to make a refund over the amount received or claimed as a refund or carryback, if in its sole discretion it believes such payment is in its best interest. Additionally, if part of [sic] all of an unused consolidated net operating loss, net capital loss, tax credit or similar type item is allocated to an Affiliate pursuant to Regulations Section 1.1502-21, and it is carried back, if utilized, or it is carried forward, whether or not utilized, to a year in which such Affiliate filed a separate income tax return or a consolidated federal income tax return with another group, any refund or reduction in tax liability arising from the carryback or carryforward shall be retained by such Affiliate and such item shall not enter into the calculation of liability to or from UWBI.

Aplt. App., Vol. I at 41.

The first of these sentences—stating that "[i]f a regulated first-tier Affiliate," i.e., the Bank, "incurs a net operating loss or excess tax credits, the regulated Affiliate is entitled to a refund equal to the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with USBI"—is arguably ambiguous. On the one hand, it purports to "entitle[ ]" the regulated affiliate "to a refund equal to the amount that it would have received had it not joined in the filing of a consolidated return." On the other hand, when contrasted with the last sentence, it does not give the Bank the right to "retain" the refund. Instead, under the first sentence, a refund received by UWBI as a result of a net operating loss incurred by the Bank is taken into account by the parties in calculating their year-end liabilities to each other.

The second and third sentences of Section A.1 afford UWBI with two types of discretion: (1) whether to pay any refund at all to a nonregulated affiliate; and (2) when it pays a refund to any affiliate, whether to pay an amount equivalent to the amount the affiliate would have received had it filed its own income tax return, or instead to pay a greater amount. These sentences thus arguably point toward something more than a mere agency relationship.

8

The last sentence of Section A.1 indicates that if a net operating loss of any affiliate is carried back to a year when that affiliate was filing a separate income tax return (or filing a consolidated return with another group), then "any refund . . . shall be retained by such Affiliate and such item will not enter into the calculation of liability to or from UWBI." This arguably suggests that, in all other situations, an affiliate does not "retain" a tax refund and, instead, refunds are taken into consideration during the annual reconciliation of liability between the parties.

Section A.2 of the Agreement, which is also contained under the heading "General Rule – Federal," states: "In essence, this Agreement requires that each first-tier subsidiary be treated as a separate taxpayer with UWBI merely being an intermediary between an Affiliate and the Internal Revenue Service . . . ." *Id.* Although the term "intermediary" is not expressly defined in the Agreement, it is commonly understood to mean "[a] mediator or go-between." Intermediary, Black's Law Dictionary (10th ed. 2014). Thus, in contrast to most of Section A.1, Section A.2 clearly points to the existence of an agency relationship between UWBI and its affiliates, rather than a debtor/creditor relationship. In other words, it suggests that UWBI will simply act as a conduit through which the refund will pass.

Section F of the Agreement, entitled "Tax Settlement Payments – Federal and State," states, in pertinent part, that affiliates are to make "[e]stimated payments of Federal . . . taxes" to UWBI on a specified quarterly basis (April 15, June 15, September 15, and December 15). *Id.* at 44. Those estimated payments are to be in "an amount equal to the amount of any estimated federal income taxes which the Affiliate would have been required to pay on or before such dates if the Affiliate had filed its own separate income tax return for such taxable period." *Id.* "Payments [by UWBI] to an Affiliate for net operating losses or similar items shall not be made under this provision, but rather on an annual basis pursuant to Section A" of the Agreement. *Id.*

In turn, Section E of the Agreement, entitled "Tax Settlement Payments – Federal," provides in pertinent part:

1. Preliminary tax settlement payments are due on or before March 15 following the end of the appropriate taxable year. Although overpayments of estimated taxes made by Affiliates are not refunded until final tax settlement is

9

done, an Affiliate with a taxable loss for the year may recover estimated taxes paid for that year before final settlement if an "expedited refund" claim is filed with UWBI by February 15 following the end of the tax year.

2. Each first-tier Affiliate shall compute its final tax settlement liability based on the amounts included for that Affiliate (and its subsidiaries, if applicable) in the consolidated federal income tax return filed. A copy of such computation will be prepared by October 31, and any differences will be resolved. Final tax settlement payments or refunds are due on or before November 15.

*Id.* at 43-44.

Considered together, Sections E and F obligate affiliates to make quarterly estimated tax payments to UWBI during the course of a taxable year, preliminary tax settlement payments to UWBI on or before March 15th following the end of the taxable year, and final tax settlement payments, if necessary, to UWBI on or before November 15th following the end of the taxable year. In turn, Section E, when considered together with Section A, obligates UWBI to (1) refund to its affiliates, by November 15th following the end of the taxable year, any overpayments of estimated taxes, (2) expedite any such refund if an affiliate has a taxable loss for the year in question and the affiliate files with UWBI an expedited refund claim by February 15th following the end of the taxable year, and (3) ensure that, when a regulated first-tier affiliate incurs a net operating loss or excess tax credits, any such refunds paid to that affiliate are equal to or greater than the amount that such affiliate would have been entitled to receive had it not joined in the filing of the consolidated tax return.

Section G of the Agreement states that "[e]ach Affiliate hereby appoints UWBI as its agent . . . for the purpose of filing such consolidated Federal income tax returns for the UWBI group as UWBI may elect to file and making any election, application, or taking any action in connection therewith on behalf of the Affiliates." *Id.* at 44.

Lastly, Section H of the Agreement, entitled "Miscellaneous," contains two relevant paragraphs. Section H.1 states:

In the event of any adjustment to the tax returns of the Group as filed (by reason of an amended return, claim for

10

refund, or an audit by a taxing authority), the liability of the parties to this Agreement shall be re-determined to give effect to any such adjustment as if it had been made as part of the original computation of tax liability, and payments between the appropriate parties shall be made within 10 business days after any such payments are made or refunds are received, or, in the case of contested proceedings, within 10 business days after a final determination of the contest.

*Id.* Further, Subsection H.4 states, in pertinent part:

The intent of this Agreement is to provide an equitable allocation of the tax liability of the Group among UWBI and the Affiliates. Any ambiguity in the interpretation hereof shall be resolved, with a view to effectuating such intent, in favor of any insured depository institution.

*Id.* at 45.

Considered in its entirety, it is apparent that the Agreement was intended to authorize the filing of a consolidated tax return and, in turn, to create a series of payment obligations between UWBI and its affiliates—including the Bank—in order to carry out the goal of filing a consolidated tax return. Affiliates are obligated, by way of both estimated and final tax payments, to pay UWBI the precise amount of their federal income tax obligations. UWBI, in turn, is obligated to refund to its affiliates any overpayments of estimated taxes. When an affiliate incurs a taxable loss due to net operating losses or excess tax credits, UWBI's obligations depend upon the nature of the affiliate. If the affiliate is a regulated, first-tier affiliate such as the Bank, then UWBI is obligated to pay that affiliate "a refund equal to" or greater than "the amount that it would have been entitled to receive had it not joined in the filing of a consolidated return with UWBI." *Id.* at 41 (§ A.1 of the Agreement). For "nonregulated first-tier Affiliates," UWBI has the discretion to decide whether or not to treat them similarly to regulated first-tier affiliates in terms of tax refunds. *Id.*

Critically, however, the Agreement is, on its face, ambiguous with respect to the type of relationship it intends to create between UWBI and regulated, first-tier affiliates, such as the Bank, regarding the ownership of refunds from the IRS. *See Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1229 (Colo. 2016) (noting that a contract is ambiguous

11

if it is reasonably susceptible of more than one meaning); *id.* ("Whether a written contract is ambiguous is a question of law that we review de novo."). On the one hand, portions of the Agreement quite clearly indicate the intent to create an agency relationship between UWBI and its regulated, first-tier affiliates. For example, Section A.2 states that "each first-tier subsidiary [is to] be treated as a separate taxpayer with UWBI merely being an intermediary between an Affiliate and the" IRS. Aplt. App., Vol. I at 41. Likewise, Section G states that UWBI is being appointed by each affiliate to act as its agent for purposes of filing the consolidated tax return and taking any action in connection therewith. On the other hand, portions of the Agreement arguably suggest the intent for UWBI to retain tax refunds before forwarding them on to regulated, first-tier affiliates. For example, parts of Section A.1 imply that UWBI will retain tax refunds and then later take them into account during the annual settlement process. In addition, the fact that Section A.1 affords UWBI with discretion regarding the amount to refund a regulated, first-tier affiliate (i.e, the exact amount of the refund or a greater amount) seems to suggest something other than an agency relationship. Finally, the ambiguity of the Agreement on this issue is compounded by the fact that it contains no language requiring UWBI to utilize a trust or escrow for tax refunds—which would suggest the existence of an agency or trust relationship—nor does it contain provisions for interest and collateral—which would be indicative of a debtor-creditor relationship. *See In re NetBank, Inc.*, 729 F.3d 1344, 1351 (11th Cir. 2013); *Fed. Deposit Ins. Corp. v. AmFin Fin. Corp.*, 757 F.3d 530, 535 (6th Cir. 2014).

\* \* \*

Notably, the Agreement itself provides a method for resolving the ambiguity. Section H.4 of the Agreement states that "[a]ny ambiguity in the interpretation hereof shall be resolved, with a view to effectuating such intent [i.e., to provide an equitable allocation of the tax liability of the Group among UWBI and the Affiliates], in favor of any insured depository institution." Aplt. App., Vol. I at 45. Quite clearly, construing the Agreement to create an agency relationship between UWBI and the Bank with respect to federal tax refunds—and thereby affording ownership of the tax refund to the Bank—is more favorable to the Bank than construing the Agreement to create a debtor/creditor relationship and thus affording ownership of federal tax refunds to UWBI. We therefore conclude that the ambiguity in the Agreement must be construed in favor of the Bank and the FDIC, and that,

12

consequently, the Agreement must be read as creating only an agency relationship between UWBI and the Bank.

*Id.* at 1270-74 (footnote omitted).

The bankruptcy trustee argues in his supplemental brief that "[t]he Agreement does not give the Bank any control over UWBI, let alone the right of interim control necessary to establish an agency" under Colorado law. Aplt. Supp. Br. at 8. He also argues that the Agreement "grants UWBI powers irreconcilable with the fiduciary duties of a common-law agent, including the right to commingle tax refunds with its other assets and use them to offset the liabilities of other members." *Id.* at 8-9.

We find these arguments unavailing. As we have explained, the Agreement is, with respect to the nature of the relationship that UWBI and the Bank intended to create with one another, poorly drafted and ambiguous. The fact that the Agreement does not address the specific points noted by the bankruptcy trustee merely confirms this conclusion. Fortunately, however, Section H.4 of the Agreement is not ambiguous and is dispositive in this case. As we noted in our original opinion, Section H.4 requires us to construe any ambiguities in favor of the Bank and the FDIC. Therefore, the Agreement must be read as creating an agency relationship between UWBI and the Bank, rather than a debtor-creditor relationship.

Because the Agreement creates an agency relationship between UWBI and the Bank, we conclude that the tax refund at issue belongs to the Bank, and that the FDIC, as receiver for the Bank, was entitled to summary judgment in its favor.

IV

We AFFIRM the judgment of the district court and REMAND to the bankruptcy court for further proceedings consistent with this opinion.